THE STATE OF OHIO, APPELLEE, *v.* MAURER, APPELLANT.

[Cite as State *v.* Maurer (1984), 15 Ohio St. 3d 239.]

(No. 84-642—Decided December 20, 1984.)

240

Mr. James R. Unger, prosecuting attorney, and Mr. Dale T. Evans, for appellee.

Mr. Randall M. Dana, public defender, Mr. David C. Stebbins and Mr. James B. Lindsey, for appellant.

CELEBREZZE, C.J. Today we are confronted with questions concerning appellant's conviction and subsequent death sentence. As we did in State v. Jenkins (1984), 15 Ohio St. 3d 164, we affirm appellant's convictions and reject appellant's challenges to this state's death penalty statutes. Additionally, we uphold the recommendation of the jury and the decision of the courts below that appellant be executed for this hideous crime.

I

As in State v. Jenkins, supra, appellant contends that the Ohio death penalty statutes violate his rights under the Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio Constitution. Specifically, appellant contends that: imposition of the death penalty is cruel and unusual punishment; the death penalty is arbitrary and capricious since prosecutors inevitably exercise discretion in pursuing capital cases; Ohio has failed to employ the least restrictive means to achieve deterrence and societal protection; the death penalty can only be imposed when deliberation and premeditation are shown to exist; the state must prove the absence of any and all mitigating factors prior to imposing a death sentence; no standard is set forth for determining who bears the burden of going forward with evidence of mitigating factors and what standard of proof applies; the instruction to a jury to "weigh" aggravating circumstances against mitigating factors is standardless; the statute is constitutionally infirm for failing to instruct juries that life imprisonment is an available sentencing option even where aggravating circumstances outweigh mitigating factors; information essential to proportionality review is not required under the statute; felony murders are treated disproportionately to premeditated murders in that the same conduct which convicts under R.C. 2903.01(B) also aggravates under R.C. 2929.04(A)(7); and defendants charged with capital offenses must be afforded a new jury during the sentencing phase.

These contentions were addressed in State v. Jenkins, supra, at paragraph one of the syllabus, where we concluded that "Ohio's statutory framework for imposition of capital punishment, as adopted by the General Assembly effective October 19, 1981, and in the context of the arguments raised herein, does not violate the Eighth and Fourteenth Amendments to the United States Constitution or any provision of the

Ohio Constitution." In view of this holding, the aforementioned constitutional arguments set forth by appellant, which were considered in *Jenkins*, must also be rejected. We therefore proceed to consider appellant's remaining challenge concerning the constitutionality of the Ohio death penalty statutes as applied in this case.

Appellant argues that the aggravating circumstance of which he was convicted is unconstitutionally overbroad. The aggravating circumstance applied to appellant was that he had committed an aggravated murder in the course of a kidnapping, as proscribed under R.C. 2929.04(A)(7). That section provides, in pertinent part, as follows:

"The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, * * * and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design."

Under R.C. 2905.01[2] a kidnapping will occur if an offender by force, threat or deception restrains an individual from liberty for the purpose of terrorizing or inflicting serious physical harm on the victim. As appellant observes, in virtually every aggravated murder the victim will be restrained from liberty for the purpose of terrorizing or the infliction of serious physical harm. Appellant therefore maintains the aggravating circumstance applied in his conviction is unconstitutionally overbroad.

In support of this argument, appellant principally relies upon *Godfrey* v. *Georgia* (1980), 446 U.S. 420. In that case, the Supreme Court vacated a death sentence predicated upon the aggravating circumstance that the murder was outrageously or wantonly vile, horrible or inhuman. In finding this aggravating circumstance overbroad, the Supreme Court reasoned that a person of ordinary sensibility could fairly conclude that virtually every murder is outrageously or wantonly vile, horrible or inhuman. Thus,

---

[2] R.C. 2905.01 provides, in part:

"(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where he is found or restrain him of his liberty, for any of the following purposes:

"(1) To hold for ransom, or as a shield or hostage;

"(2) To facilitate the commission of any felony or flight thereafter;

"(3) To terrorize, or to inflict serious physical harm on the victim or another;

"(4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against his will;

"(5) To hinder, impede, or obstruct a function of government, or to force any action or concession on the part of governmental authority.

"(B) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall knowingly do any of the following, under circumstances which create a substantial risk of serious physical harm to the victim:

"(1) Remove another from the place where he is found;

"(2) Restrain another of his liberty;

"(3) Hold another in a condition of involuntary servitude."

the aggravating circumstance did not sufficiently distinguish the *Godfrey* case, in which a death sentence was imposed, from those cases in which death sentences were not imposed.

Appellant's argument for the application of *Godfrey* would conceivably possess merit were it not for this court's prior decision in *State* v. *Logan* (1979), 60 Ohio St. 2d 126 [14 O.O.3d 373], and the application of the underlying rationale of that case to the aggravating circumstance of kidnapping under R.C. 2929.04(A)(7) in *Jenkins*.

In *Logan,* the court concluded that "[w]here the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions." *Id.* at paragraph (a) of the syllabus. See, also, *State* v. *Price* (1979), 60 Ohio St. 2d 136, 143 [14 O.O.3d 379].[3] Cf. *State* v. *Moss* (1982), 69 Ohio St. 2d 515 [23 O.O.3d 447], certiorari denied (1983), 459 U.S. 1200 (convictions sustained for aggravated murder as well as for the underlying felony of aggravated burglary), and *State* v. *Bickerstaff* (1984), 10 Ohio St. 3d 62 (convictions sustained for aggravated murder as well as for the underlying felony of aggravated robbery).

In *State* v. *Jenkins* we required prolonged restraint, secretive confinement, or significant movement apart from that involved in the underlying crime in order to justify the application of the aggravating circumstance of kidnapping under R.C. 2929.04(A)(7). We conclude that any problems of overbreadth in relation to the aggravating circumstance of kidnapping have been extinguished.

Application of the above-described standard demonstrates that the aggravating circumstance of kidnapping was properly applied to appellant, since the record overwhelmingly demonstrates that prolonged restraint, secretive confinement as well as substantial movement took place apart from the separate underlying crime of aggravated murder.

## II

Appellant next contends that it is a violation of the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution to death-qualify a jury prior to the guilt phase of a bifurcated capital proceeding. In *State* v. *Jenkins, supra,* we rejected this argument and stated:

---

[3] In *Logan, supra,* at 135, it was stated that "the restraint and movement of the victim had no significance apart from facilitating the rape. The detention was brief, the movement was slight, and the victim was released immediately following the commission of the rape. In such circumstances, we cannot say that appellant had a separate animus to commit kidnapping."

" 'Although the right to a jury trial includes the right to a jury venire drawn from a representative cross-section of the community, it does not include the right to be tried by jurors who are unable or unwilling to follow the law and the instructions of the trial judge in a capital case.' " *Id.* at 188, citing *Keeten* v. *Garrison* (C.A.4, 1984), 742 F. 2d 129, 133.

Accordingly, we reiterate our holding in *State* v. *Jenkins, supra,* at paragraph two of the syllabus, that "[t]o death-qualify a jury prior to the guilt phase of a bifurcated capital prosecution does not deny a capital defendant a trial by an impartial jury." As a result, we find no error in the jury selection process employed at the trial of appellant.[4]

### III

R.C. 2929.05 requires this court to review the record and independently determine whether the aggravating circumstances the defendant was found guilty of committing outweigh the mitigating factors found to exist.

We have already set forth the facts surrounding this murder. Appellant was found guilty of the aggravating circumstance of having committed the murder while committing, attempting to commit or fleeing immediately after committing kidnapping.

Appellant's first mitigation witness was Gloria A. Sanders, forensic coordinator for the Central Stark County Mental Health Center. The center's staff conducted evaluations and testing of appellant and concluded that he had an I.Q. of 77 and diagnosed appellant as having a borderline personality disorder. Specifically, Sanders testified that "[h]e has presented himself as a fairly inept, impulsive type person[,] [r]esponding poorly to stressful situations[;] so that would indicate that he did not use good reasoning at all times." She also indicated that appellant was sincere in his protestations of remorse and that he had a history of alcohol problems. She also stated her belief that his two attempts at suicide while in jail had been serious ones. The import of the testimony was that appellant was remorseful and often displayed poor judgment. This testimony did not suggest that appellant was incapable of controlling his conduct or appreciating the import of his actions.

Testimony of friends, family and others established that appellant had dropped out of high school in his junior year to join the Marine Corps and had begun drinking then. Ultimately, appellant was absent without leave two or three times from the Marines and was discharged for bad conduct. It also established that appellant had a history of drinking problems and that when he drank he became loud, boisterous, surly, and likely to start fights. After having been imprisoned for a short time on convictions for breaking and entering and grand theft, appellant was admitted to the

---

[4] Significantly, appellant does not argue, as did the appellant in *State* v. *Jenkins, supra,* that any of the potential jurors excused on the authority of *Witherspoon* v. *Illinois* (1968), 391 U.S. 510 [46 O.O.2d 368], were less than unequivocal or unambiguous in their commitment to vote against the death penalty under all circumstances.

Community Treatment and Correction Center which is a halfway house having as its purpose assisting persons convicted of nonviolent offenses with personal problems, vocational planning, etc. After being with the center from May to August 1977, he was released and considered to have successfully completed the program. In 1979, appellant also completed a program at Newton House, a halfway house for recovering alcoholics. He was considered to have completed that program successfully as well and was released early in order to seek employment.

Appellant married in December 1980 and lived with his wife and four stepchildren. Evidence established that he had a good relationship with those children. Appellant's mother testified that appellant did not drink for about a year and one-half after getting married. Appellant lost his job in June 1982 and was unemployed at the time of the offense. There was testimony that appellant had been drinking on the morning of the murder but none to the effect that he was drunk at the time of the offense. There was also no claim made that appellant was unable to appreciate the wrongfulness of his conduct.

We cannot conclude that this evidence demonstrates the existence of any mitigating factors which would weigh against the aggravating circumstance appellant was found guilty of committing.

While appellant did not have a lengthy prior criminal record, he was on probation at the time of the offense as the result of previous criminal convictions. Thus we give virtually no weight to the fact that appellant lacks a significant history of prior convictions which is a mitigating factor enumerated in R.C. 2929.04(B)(5).

The types of circumstances under which appellant was living, *i.e.*, alcohol problems, loss of job, etc., are the sort that numerous people live under without turning to criminal conduct, much less the serious crime that appellant was convicted of here. Moreover, appellant, unlike many others with similar problems, was given the opportunity for rehabilitation at Newton House and the Community Treatment and Correction Center, and, despite this help, continued on a path of conduct which led to this offense.

We find no factors which mitigate against the imposition of the death penalty herein and conclude that the aggravating circumstance appellant was found guilty of committing outweighs, beyond a reasonable doubt, the mitigating factors herein.

The scope of this court's review in determining whether the imposition of the death penalty is appropriate includes a determination as to whether the sentence is disproportionate to that imposed in similar cases. R.C. 2929.05.

We have reviewed the sentencing decisions of lower courts imposing the penalty of death which have been filed with this court and conclude that the penalty herein was not disproportionate. Appellant's suggestion that disproportionality can be measured by comparing the number of the

aggravating circumstances charged in each capital indictment is without merit. R.C. 2929.03 requires only one aggravating circumstance to be proven to render a defendant subject to the death penalty and the determination of whether it shall be imposed requires a weighing of factors in mitigation as well. Merely counting the number of specifications charged does not demonstrate a disproportionate impact without reference to all aspects of the crimes.

## IV

A concomitant aspect of our review and that undertaken by the courts of appeals under R.C. 2929.05(A) is to determine "* * * whether the sentencing court properly weighed the aggravating circumstances the offender was found guilty of committing and the mitigating factors."

R.C. 2929.03(F) sets forth the duties of the trial court in imposing sentence and provides in part:

"The court * * *, when it imposes sentence of death, shall state in a separate opinion its specific findings as to the existence of any of the mitigating factors set forth * * *, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances * * * were sufficient to outweigh the mitigating factors."

In its sentencing opinion the trial court found that none of the mitigating factors enumerated in R.C. 2929.04(B)(1), (2), (3), (4) and (6) was present. The court in effect concluded that appellant did lack a significant history of prior criminal convictions as set forth in R.C. 2929.04(B)(5). It then summarized the evidence presented in mitigation and concluded that "[t]he Court further finds that the aggravating circumstance of which the defendant was found guilty outweighs the evidence of mitigating factors presented herein." The judge did not articulate any reasons for reaching that conclusion.

Appellant argues that because the trial court failed to articulate its reasoning, appellant was denied a meaningful, independent trial and appellate review as required by R.C. 2929.03(F), 2929.05, and the United States Constitution.

The United States Supreme Court has consistently given favorable endorsement to those aspects of state death penalty statutes which incorporate meaningful appellate review of sentencing. See *Gregg* v. *Georgia* (1976), 428 U.S. 153; *Proffitt* v. *Florida* (1976), 428 U.S. 242. The purpose of these provisions is to insure that the death penalty is not being arbitrarily or disproportionately imposed by juries.

Consistent with these holdings, Ohio's General Assembly enacted R.C. 2929.03(F) and 2929.05, delineating the duties of the trial judge and reviewing courts with respect to imposing the death penalty. R.C. 2929.05 requires the courts of appeals, and the Supreme Court as well, to independently weigh all the facts and other evidence in determining whether

the aggravating circumstances outweigh the mitigating factors in reviewing the sentencing court's determination. As a necessary corollary to that requirement, the courts of appeals and the Supreme Court must articulate the reasons why the aggravating circumstances outweigh the mitigating factors.

Inasmuch as the trial judge did not specify the reasons why the aggravating circumstance outweighed the mitigating factors, the trial judge's opinion was not made in compliance with R.C. 2929.03(F).

The court of appeals, in its separate opinion under R.C. 2929.05, fulfilled all the requirements imposed therein. It recited the evidence of appellant's lack of prior convictions (R.C. 2929.04[B][5]), his family life, his low intelligence, his psychiatric and drinking problems, and his predisposition to violence. The court fully articulated its reasons for discounting appellant's claims of remorse.

Appellant's contention that the court of appeals merely "rubber-stamped" the trial court's judgment is without merit. The appellate opinion gave far greater consideration to the factors presented.

In view of all of the circumstances herein, including our independent review of the record in Part III, *supra*, we cannot conclude that appellant was prejudiced by the failure of the trial court to enunciate its reasoning. Indeed, we believe the purpose of an independent review at each stage of the appellate process was designed, at least in part, to correct such omissions.

In so holding we do not intend to trivialize the duty of the trial court under R.C. 2929.03(F) to articulate its reasoning or to suggest that such an omission is insignificant. It is not. The failure of a trial court to comply with this aspect of R.C. 2929.03(F) disrupts the review procedures enacted by the General Assembly by depriving the defendant and subsequent reviewing courts of the trial court's perceptions as to the weight accorded all relevant circumstances. In a closer case, those perceptions could make a difference in the manner in which a defendant pursues his appeal and in which a reviewing court makes its determination.

V

Appellant next complains the trial court erred in failing to instruct the jury on "specific intent to kill," and that a specific finding of such intent is required under R.C. 2903.01(D) to sustain a conviction for aggravated murder.

In *State v. Jenkins, supra,* we held at paragraph nine of the syllabus, that "[a] capital defendant is not entitled to a special verdict on the question of intent to kill at the guilt phase of a capital prosecution." Consequently, appellant's allegation on this issue is without merit.

Appellant's assertion that the trial judge failed to properly instruct the

jury is completely discredited by a reading of the record.[5] The court instructed the jury as follows:

"With respect to the first count, before you can find the defendant Donald Lee Maurer guilty of the first count of Aggravated Murder you must find beyond a reasonable doubt as follows:

"(1) That Dawn Marie Hendershot was a living person and that her death was caused by the defendant, Donald Lee Maurer in Stark County, Ohio, on or about the 29th day of September, 1982, that the killing was done purposely and with specific intent, and that the killing was done while the defendant was committing or attempting to commit or fleeing immediately after committing or attempting to commit kidnapping.

"Purpose to kill is an essential element of the crime of Aggravated Murder. It must be established in this case that at the time in question there was present in the mind of the defendant a specific intention to kill Dawn Marie Hendershot while the defendant was committing or fleeing immediately after committing or attempting to commit kidnapping.

"If a wound or injury is inflicted * * * in a manner calculated to destroy life, purpose to kill may be inferred therefrom. Such inference is not conclusive but may be accepted or rejected by you in your deliberations. If you accept such inference then you must consider the sum totality of all the evidence, facts and circumstances bearing upon the issue of intent."

The foregoing charge complies with R.C. 2903.01(D). Appellant's argument in this regard is groundless.

## VI

Appellant also argues that in a capital case, the state's burden of proof should be "proof beyond all doubt." As we held in State v. Jenkins, supra, at paragraph eight of the syllabus, "[t]he standard of proof in a capital prosecution is proof beyond a reasonable doubt as defined in R.C. 2901.05 and not proof beyond all doubt." This argument is therefore without merit.

## VII

Appellant next complains that his due process rights were violated because the trial court refused to accept the first verdict returned by the jury. The verdict here under attack pertained to the charge of aggravated

---

[5] As part of his discussion, appellant notes that the California Supreme Court has found a requirement for a special instruction on the issue of specific intent to kill. See, e.g., People v. Garcia (1984), 36 Cal. 3d 539, 205 Cal. Rptr. 265, 684 P. 2d 826. The holding of our California counterpart, however, is founded on the express terms of a California statute: "The penalty for a defendant found guilty of murder in the first degree shall be death or confinement in state prison for a term of life without possibility of parole in any case in which one or more * * * special circumstances has been charged and specially found * * *." (Emphasis added.) Cal. Penal Code Section 190.2. Because Ohio's statutes do not contain such an express provision, we do not find the analysis of the California court helpful.

murder and its related specification, but the jury failed to enter a finding on the specification form.

From the record, it is clear the court refused the verdict because it was incomplete. The jury had arrived at a decision, but had not made an entry on the verdict form with respect to the aggravating circumstance.

In *Hurley* v. *State* (1890), 4 Ohio C.C. 425, 428, when confronted with an analogous question, the court stated:

"* * * But if there was any defect in the form, merely, of the verdict first returned, we understand that the court has the right to decline to receive it, and require the jury to retire for further consideration, and without in any way interfering with their province as to what verdict they shall find, may properly instruct them as to its form, or submit to them one to be adopted if agreed upon * * *."

Similarly, in *State* v. *Hale* (App. 1955), 74 Ohio Law Abs. 274, appeal dismissed (1956), 165 Ohio St. 104 [59 O.O. 104], it was held that where jurors returned a verdict upon a form which was improper, and where the error was explained to them and proper forms were presented, there was no error prejudicial to the defendant where a guilty verdict was later rendered on the proper form.

In the second paragraph of the syllabus in *State* v. *McNicol* (1944), 143 Ohio St. 39 [27 O.O. 569], this court held: "Jury verdicts in criminal cases are to have reasonable constructions and are not to be declared void unless from necessity originating in doubt of their import or irresponsiveness to the issue submitted, or unless they show a manifest tendency to work injustice."

In the case *sub judice,* the jury, after being notified of its mistake, returned with a properly executed verdict form. In support of his assault on that verdict, however, appellant has failed to show any "doubt of * * * [its] import," its "irresponsiveness," or its "manifest tendency to work injustice." We likewise can detect no prejudice or contravention of appellant's due process rights. Consequently, we hold that appellant's claim on this issue is destitute of merit.

## VIII

Appellant filed a motion for change of venue with the trial court claiming that pretrial publicity, overwhelming community interest, and antagonism concerning the facts precluded him from receiving a fair and impartial trial. The trial court took the matter under advisement until such time as it could be determined whether a fair and impartial jury could be seated. Prior to swearing in the jury, a hearing was held on the motion, at which time the court, satisfied that the extensive *voir dire* procedure had indeed produced an impartial jury, overruled appellant's motion. Appellant claims that the judge's venue ruling was erroneous in that the trial court failed to recognize the likelihood of prejudice present, resulting in a

denial of appellant's right to an impartial jury as guaranteed by the Sixth and Fourteenth Amendments.

Crim. R. 18(B), R.C. 2901.12(I) and 2931.29 provide for a change of venue when it appears to the trial court, either by affidavit or evidence in open court, that a fair and impartial trial cannot be had in the county where a cause is pending.[6]

As this court observed in *State* v. *Fairbanks* (1972), 32 Ohio St. 2d 34, 37 [61 O.O.2d 241]:

"A change of venue rests largely in the discretion of the trial court, and there are numerous cases holding that appellate courts should not disturb the trial court's ruling on a motion for a change of venue in a criminal case unless it is clearly shown that the trial court had abused its discretion. * * * [Citations omitted.]"

"The meaning of the term 'abuse of discretion' * * * connotes more than an error of law or of judgment; it implies an unreasonable, arbitrary or unconscionable attitude * * *." *Steiner* v. *Custer* (1940), 137 Ohio St. 448 [17 O.O. 170], paragraph two of the syllabus; *Conner* v. *Conner* (1959), 170 Ohio St. 85 [9 O.O.2d 480]; *Rohde* v. *Farmer* (1970), 23 Ohio St. 2d 82, 87 [52 O.O.2d 376]; *State* v. *Adams* (1980), 62 Ohio St. 2d 151, 157-158 [16 O.O.3d 169]; *Dayton, ex rel. Scandrick,* v. *McGee* (1981), 67 Ohio St. 2d 356, 359 [21 O.O.3d 225]; *Blakemore* v. *Blakemore* (1983), 5 Ohio St. 3d 217, 219; and *Ojalvo* v. *Bd. of Trustees of Ohio State Univ.* (1984), 12 Ohio St. 3d 230, 232.

It has long been the rule in Ohio that "[t]he examination of jurors on

---

[6] Crim. R. 18 provides in part:

"(A) The venue of a criminal case shall be as provided by law.

"(B) Upon the motion of any party or upon its own motion the court may transfer an action to any court having jurisdiction of the subject matter outside the county in which trial would otherwise be held, when it appears that a fair and impartial trial cannot be held in the court in which the action is pending."

R.C. 2901.12(I) states:

"Notwithstanding any other requirement for the place of trial, venue may be changed upon motion of the prosecution, the defense, or the court, to any court having jurisdiction of the subject matter outside the county in which trial would otherwise be held, when it appears that a fair and impartial trial cannot be held in the jurisdiction in which trial would otherwise be held, or when it appears that trial should be held in another jurisdiction for the convenience of the parties and in the interests of justice."

R.C. 2931.29 concerns the mechanism for effecting a change of venue if so ordered by the court:

"When a change of venue is ordered pursuant to section 2901.12 of the Revised Code, the clerk of the court in which the cause is pending shall make a certified transcript of the proceedings in the case, which, with the original affidavit, complaint, indictment, or information, he shall transmit to the clerk of the court to which said case is sent for trial, and the trial shall be conducted as if the cause had originated in the jurisdiction of the latter court. The prosecuting attorney, city director of law, or other officer who would have prosecuted the case in the court in which the cause originated shall take charge of and try the cause, and the court to which the cause is sent may on application appoint one or more attorneys to assist the prosecutor in the trial, and allow the appointed attorneys reasonable compensation."

their *voir dire* affords the best test as to whether prejudice exists in the community against the defendant, and where it appears that opinions as to the guilt of the defendant of those called for examination for jurors are not fixed but would yield readily to evidence, it is not error to overrule an application for a change of venue, in absence of a clear showing of an abuse of discretion." *State* v. *Swiger* (1966), 5 Ohio St. 2d 151 [34 O.O.2d 270], paragraph one of the syllabus.

We believe that generally "a careful and searching *voir dire* provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality." *State* v. *Bayless* (1976), 48 Ohio St. 2d 73, 98 [2 O.O.3d 249], vacated in part on other grounds (1978), 438 U.S. 911.

Appellant asserts that the trial court's venue decision does not comport with the "reasonable likelihood" of prejudice test enunciated by the United States Supreme Court in *Sheppard* v. *Maxwell* (1966), 384 U.S. 333,[7] and adopted by this court in *State* v. *Fairbanks, supra.* Our decision in *Fairbanks* summarizes distinctions which are also relevant to the case *sub judice* as follows:

"In *Sheppard,* there was extensive press coverage prior to and during the trial. The testimony of witnesses was published daily, jurors were identified and inflammatory articles and pictures were published along with lurid stories. In the midst of this sensationalism, the jurors were not sequestered nor was their access to the news media restricted. * * *" *Id.* at 37.

In *Sheppard, supra,* the Supreme Court evidenced concern regarding the entire episode but repeatedly stressed the lack of courtroom security and prejudice arising during trial. The setting of the trial herein simply did not approach the massive, pervasive, carnival atmosphere, nor the jury pressure, found in *Sheppard.* The trial judge herein took courtroom security measures, the lack of which was a point of criticism in *Sheppard.* Additionally, the jury was statutorily sequestered during deliberation until a verdict was reached. The jury was vigorously admonished not to discuss the case with anyone nor to read or view any media accounts of the trial.

Lastly, appellant has failed to demonstrate any abuse of discretion, as defined by this court, in the trial judge's ruling. The court's order followed several days of *voir dire* and lengthy argument on the change-of-venue motion. The ruling reflects an application of the test recognized by this court in *State* v. *Lockett* (1976), 49 Ohio St. 2d 48 [3 O.O.3d 27], reversed on other grounds (1978), 438 U.S. 586. In *Lockett,* this court reaffirmed

---

[7] We have previously noted that "[t]he court, in *Sheppard,* reversed this court on the issue of prejudicial publicity prior to and during trial. In *Sheppard,* the court held that a showing of identifiable prejudice to the defendant is not necessary where there is a likelihood that prejudicial news prior to the trial will prevent a fair trial. If such is the case, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." *State* v. *Fairbanks, supra,* at 37.

our belief that where the record on *voir dire* establishes that prospective veniremen have been exposed to pretrial publicity but affirmed they would judge the defendant solely on the law and evidence presented at trial, it is not error to empanel such veniremen. As we have often stated, the best test for a change of venue is the ability to seat an impartial jury. *State* v. *Osborne* (1976), 49 Ohio St. 2d 135, 139-141 [3 O.O.3d 79], vacated in part on other grounds (1978), 438 U.S. 911; *State* v. *Bayless, supra,* at 96-99. In this case we note that appellant was apparently satisfied with the jury panel in that he did not find it necessary to exercise all of his peremptory challenges. In short, this is not a case in which there is a reasonable likelihood that appellant did not receive a fair trial. Accordingly, we find that the court did not abuse its discretion in denying the motion for change of venue and we reject appellant's claim of error.

Appellant also filed a motion to sequester the jury throughout all the proceedings. The trial court granted this motion as to the jury's deliberations, but not as to the trial itself. Appellant further moved the court to sequester the jury during the interval between the guilt and penalty phases of the trial. This motion was denied.

Appellant contends that it was prejudicial not to sequester the jury during the entire proceeding. He further asserts that R.C. 2945.33 and Crim. R. 24(G)(2)(c) require the court to sequester the jury during the interval of time between the guilt and penalty phases in capital cases.[8]

The above-referenced rule and statute require the trial court to sequester the jury in a capital offense case after the cause has been submitted to them. Sequestration during deliberations must continue "* * * until a verdict is rendered *or* the jury is discharged * * *." (Emphasis added.) Crim. R. 24(G)(2)(c). Crim. R. 24(G) also provides that the court "may" sequester the jury before the case is finally submitted to them. Such deter-

---

[8] Crim. R. 24(G)(2) provides in part:

"(c) After submission of a capital case to the jury, the jury shall remain under the supervision of an officer of the court until a verdict is rendered or the jury is discharged by the court."

Likewise, R.C. 2945.33 states:

"When a cause is finally submitted the jurors must be kept together in a convenient place under the charge of an officer until they agree upon a verdict, or are discharged by the court. The court, except in cases where the offense charged may be punishable by death, may permit the jurors to separate during the adjournment of court overnight, under proper cautions, or under supervision of an officer. Such officer shall not permit a communication to be made to them, nor make any himself except to ask if they have agreed upon a verdict, unless he does so by order of the court. Such officer shall not communicate to any person, before the verdict is delivered, any matter in relation to their deliberation. Upon the trial of any prosecution for misdemeanor, the court may permit the jury to separate during their deliberation, or upon adjournment of the court overnight.

"In cases where the offense charged may be punished by death, after the case is finally submitted to the jury, the jurors shall be kept in charge of the proper officer and proper arrangements for their care and maintenance shall be made as under section 2945.31 of the Revised Code."

mination is left to the sound discretion of the trial court. *State* v. *Osborne, supra,* 141-142; *White* v. *Maxwell* (1963), 174 Ohio St. 186, 189 [22 O.O.2d 141].

As we have previously noted, the term "abuse of discretion" connotes more than an error of law or judgment. It implies that the court's attitude is unreasonable, arbitrary or unconscionable. The trial judge routinely admonished the jury not to discuss the case or read any news accounts. He continuously and vigorously emphasized the importance of adherence to the court's orders during both phases of the trial.[9] We believe that the precautions taken, based in part on our finding that the pretrial publicity fell well short of justifying a change of venue, clearly demonstrate that the court's decisions relative to sequestration were not in error.

If it had been the intention of the legislature to mandate sequestration

---

[9] The trial record reveals several comprehensive admonitions by the court to the jury regarding orders of the court, the jury's duty, role, and contact with outside influences. The following admonition was given by the judge prior to excusing the jury for the interval of time between trial phases, and appears particularly relevant to the issues herein:

"The alternate jurors should know that the jury has brought back a verdict of Aggravated Murder. They've also brought back a verdict of guilty as to the aggravated circumstance. Now this then requires another trial. The other trial has to do with the sentencing procedure. Counsel for both sides have represented to me that they each have witnesses in addition to the testimony that has been before the jury already. There will be other testimony adduced at that time and that some time is needed for the preparation of the witnesses to make sure they get here. So what I have done is I have scheduled the next hearing for 9:00 o'clock on Monday morning. Your [*sic*] not going to be sequestered during that period of time, but the admonition I've been giving all along about not talking to anyone about the case or permitting anyone to talk to you about the case is obviously more imperative now. Nor will you read anything about the case or listen to anything so far as you can avoid doing so on radio or seeing anything on television. Now this is important at this state of the proceedings because the next trial as [*sic*] just as important as the trial you've gone through and we want to be sure that everybody's rights, the rights of the State and the rights of the defendant are amply protected so you will follow the admonition I have been giving you. Now also, the persons who have been any [*sic*] participants in the trial here are aware of the fact that we put an order out prohibiting any perspective [*sic*] witnesses, any jurors, any of the staff the prosecution and defense lawyers, any of the personnel of the court itself from giving any interview or talking to anybody from the media for any purpose whatsoever. Now this admonition still stands. Not the admonition, this is a rule of the court. It's an order of the court. Now it's been represented to me that in some of the proceedings we've had here that there was a likelihood I think likelihood was the word used or possibility that the family of Dawn Marie Hendershot may actually be witnesses in the next phase of it. There is a likelihood, let us say that the family of the defendant may very well be witnesses at the next phase of the case. There is no firm representation that this is the fact, but the reason I'm saying this is I would understand that those two families would be bound by the order we're talking about. The court cannot put an order on the news media themselves to say just what they can and cannot do and [in] as a direct a fashion as we can with respect to any participants in the trial, because this case is not over with. We have the other phase with respect to it and the admonition about not talking to anybody or giving any interviews of any kind by any of the participants of the trial is still part of the order of the court and we would expect it would be obeyed. Now, we're going to continue then this matter, all the jurors will be back again at 9:00 o'clock on Monday morning for continuance of the trial. * * *"

during the entire trial of a capital case, it would have expressly done so. Sequestration necessarily falls within the general statutory and rule provisions which leaves the matter, as to the separation of the jury prior to deliberation, to the discretion of the court trying the cause. Crim. R. 24(G)(1); *White* v. *Maxwell, supra,* at 189; *State* v. *Osborne, supra,* at 141-142.

We find it significant that in the detailed procedures set forth in R.C. 2929.03 no sequestration requirement is expressed for any portion of the penalty phase. Additionally, the statutory provisions make no reference to any mandate that sequestration is required during the interval between trial phases or prior to submission of the case to the jury relative to their penalty deliberations. See paragraph twelve of the syllabus in *State* v. *Jenkins, supra.*

When enacting Ohio's death penalty provisions, the legislature was certainly aware of Ohio's specific statutory and Criminal Rule provisions concerning jury sequestration as "* * *'[t]he legislature is presumed to be cognizant of all prior sections of the Code.' * * *'" *Bobb* v. *Marchant* (1984), 14 Ohio St. 3d 1, 3. Since the legislature was aware of Ohio's existing sequestration statutes and Criminal Rules when it amended R.C. 2929.03 in 1981, it would seem that the legislature intended for criminal defendants in capital cases to fall within the purview of Ohio's sequestration laws. We conclude that the trial court correctly applied R.C. 2945.33 and Crim. R. 24 to the guilt phase of the trial, as is traditionally done. These provisions only require sequestration at the penalty phase of a capital case when the cause is submitted for jury deliberations. Sequestration then terminates upon "discharge" at the end of the penalty deliberations and jury recommendation.[10]

## IX

Appellant filed a motion to suppress all statements made to law enforcement personnel on the grounds that they were taken in violation of due process guarantees, right to counsel, and his right against self-incrimination. The trial court overruled the motion after a hearing thereon.

At the hearing, Detective Bruce A. Wilson testified that a preliminary statement had first been taken from appellant on the morning of October 1, 1982, in which appellant stated that he had not seen the victim after taking her and some other children to school on the morning of September 29, 1982. Appellant was voluntarily brought to the station by neighbors. He was not placed under arrest but was read *Miranda* warnings and signed a

---

[10] In this case we note that the jury was properly separated and kept in the charge of a court officer during their deliberations and meals in the penalty phase. A recommendation was returned on the same day as deliberations began so that overnight arrangements were not needed.

waiver. He was free to leave the station at any time and did so after making his statement.

Detective Wilson went on to testify that he and two F.B.I. agents went to appellant's house at about 10:19 p.m. that evening. The officers asked appellant if he would return to the police station to discuss some discrepancies in his earlier statement. Appellant's wife was told that he was not under arrest but that the officers would like to talk with him. Appellant responded that he would go with the officers voluntarily. As they were leaving, appellant's wife asked if her husband should take his car or ride with the police. The officers said it did not matter and appellant replied that he would ride with them. Wilson testified that appellant was not under arrest and was free to refuse to go.

The group arrived at the station at 10:40 p.m. The appellant was reread his *Miranda* rights, which he said he understood and was again advised that he was not under arrest. Although appellant was by this time a suspect, Wilson testified that he was not under arrest, was free to choose not to come to the police station and was free to leave — until he admitted involvement in the crime. Prior to the taking of any statements at the station, the police reminded appellant that if he did not want to talk he did not have to.

When certain contradictions in his morning statement were disclosed, appellant stated he had lied and changed his story. When faced with further inconsistencies in his statement, appellant stated to Wilson, "Bruce, let me make you this deal. Let me go home and I will talk this over with my wife and then I will come back and show you where Dawn is buried." Wilson replied, "for Gods sake Donnie tell me the truth, did you kill Dawn Marie Hendershot?" Appellant then again asked if he could go home, and subsequently admitted killing the victim.

After again being given his *Miranda* rights appellant dictated a typed statement and provided a tape-recorded admission of his involvement.

Neither appellant nor his wife testified at the suppression hearing.

Appellant asserts that the statements were inadmissible as fruits of an illegal arrest in violation of the Fourth and Fourteenth Amendments and were obtained in violation of both due process guarantees and his rights outlined in *Miranda* v. *Arizona* (1966), 384 U.S. 436 [36 O.O.2d 237].

It is settled law that a person arrested without probable cause cannot have incriminating statements, obtained after the arrest, used against him at trial. *Brown* v. *Illinois* (1975), 422 U.S. 590. The magic words "you are under arrest" are not necessary to constitute an arrest. Any police confinement beyond the parameters in *Terry* v. *Ohio* (1968), 392 U.S. 1 [44 O.O.2d 383],[11] is the key to what constitutes an arrest. If one is deprived of

---

[11] The court in *Terry* observes at 19, fn. 16: "* * * Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred. * * *"

his movement by the state, he is in custody and considered under arrest, if he could not have attempted to leave. *Dunaway* v. *New York* (1979), 442 U.S. 200; *Florida* v. *Royer* (1983), 460 U.S. 491; *Brown, supra.*

A suspect cannot be detained without reasonably objective grounds. *United States* v. *Mendenhall* (1980), 446 U.S. 544, at 555. Mere suspicion is not enough. *Royer, supra.* If an illegal arrest is made by the police, the subsequent issuance of *Miranda* warnings to the accused will not cure the original unlawful act. *Miranda* concerns the Fifth and Sixth Amendment guarantees. The Fourth Amendment concerns illegal arrests, and the fruits therefrom. The exclusionary rule is a distinct safeguard from *Miranda's* protection. *Brown, supra.*

The test giving rise to the need of *Miranda* warnings, however, is custody. *Beckwith* v. *United States* (1976), 425 U.S. 341. The findings of legal custody are most often demonstrated by a warrant or probable cause. *Royer, supra.* If any statements are "seized" during illegal custody, they are inadmissible. *Dunaway* v. *New York, supra.*

These safeguards are only afforded to those in custody and not to those who voluntarily make statements regardless of custody. *Miranda, supra,* at 444. In the absence of a formal arrest, Miranda warnings are only required where there has been such a restraint on a person's freedom of movement as to render him "in custody." *State* v. *Buchholz* (1984), 11 Ohio St. 3d 24, 26; *Berkemer* v. *McCarty* (1984), __ U.S. __, 82 L. Ed. 2d 317; *Oregon* v. *Mathiason* (1977), 429 U.S. 492, at 495.

The setting in the case *sub judice* is similar to that found in the Supreme Court's recent opinion in *California* v. *Beheler* (1983), __ U.S. __, 77 L. Ed. 2d 1275. In *Beheler,* a defendant was involved in a robbery which resulted in one of the accomplices shooting and killing the victim. The defendant called the police, identified the triggerman, and allowed the police to search the backyard for the gun which had purportedly been hidden there by the accomplices. Later that same day, the defendant voluntarily accompanied the police to the station house, where he was specifically told that he was not under arrest. Without giving him *Miranda* warnings, the police questioned him for some thirty minutes, during which time he gave a statement that essentially amounted to a confession. Subsequently, he was arrested; he then gave a second, taped confession after being advised of his rights. The judgment of the state court, which had suppressed the confession, was reversed. The United States Supreme Court held in *Beheler* that the ultimate inquiry as to whether a person is in "custody" for purposes of *Miranda* is whether the suspect has been subject to a formal arrest or to equivalent restraints on his freedom of movement and that under the circumstances, no warnings need to have been given.

This holding is in accord with the Supreme Court's earlier decision in *Beckwith, supra,* in which it rejected the notion that the "in custody" requirement was satisfied merely because the police interviewed a person

who was the "focus" of a criminal investigation. The *Beckwith* court went on to provide at 347 that *"Miranda* implicitly defined 'focus,' * * * as 'questioning initiated by law enforcement officers *after* a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' * * *'' (Quoting *Miranda, supra,* at 444, as noted with approval in *Beheler, supra,* at 1279, fn. 2.)

In the case *sub judice,* appellant was continuously advised by the police that he was not under arrest, did not have to go to the station, and was free to leave. His eventual request to leave was accompanied with an admission of involvement in the crime, *i.e.,* "* * * Let me go home * * * and then I will come back and show you where Dawn is buried." It is not necessary to determine whether the police had sufficient grounds to arrest appellant when he voluntarily came to the station that evening. There is substantial testimony which indicates that appellant was free to leave the station up until he incriminated himself. See *State* v. *Barker* (1978), 53 Ohio St. 2d 135, 137-139 [7 O.O.3d 213], certiorari denied (1978), 439 U.S. 913. However, after appellant's admission, the police had more than probable cause to place him in custody by preventing him from going home. Additionally, at the time he admitted killing the victim, appellant had repeatedly been provided his *Miranda* rights, signed a *Miranda* waiver, read a rights card, waived counsel, and voluntarily made a statement.[12]

Based on the instant facts as viewed in light of the United States Supreme Court's holdings, the statements were not the product of an illegal arrest and were obtained in full compliance with the requirements of *Miranda.*

Appellant also asserts that the statements were involuntary and hence in violation of his due process guarantees under the federal and Ohio Constitutions.

The question of whether a confession is voluntary is to be determined by looking at the "totality of the circumstances" under which the confession was made. *Haynes* v. *Washington* (1963), 373 U.S. 503; *Barker, supra,* at 140-141; *State* v. *Edwards* (1976), 49 Ohio St. 2d 31 [3 O.O.3d 18], vacated in part on other grounds (1978), 438 U.S. 911.

The facts show that Detective Wilson had been acquainted with appellant for several years and had previously written a letter to the parole board on his behalf. Speaking hypothetically, Wilson told appellant that in some homicide cases, punishment other than death, perhaps life imprisonment or confinement in a mental institution, could be imposed. Appellant was clearly advised that the officers could not predict any outcome.

In *Barker* we held that "the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience

---

[12] Prior to taking a written statement from appellant he was twice advised of his *Miranda* rights to which he replied that "it was unnecessary because he knew them" and that "I don't want to have a lawyer present."

of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *Id.* at paragraph two of the syllabus.

A review of the facts in the instant case reveals that both the trial court's and the court of appeals' determinations as to the voluntary nature of appellant's confession are justified. The fact that appellant's admission was elicited after questioning by the police is merely one of the circumstances which is to be taken into account in determining if his inculpatory statement is voluntary. *Id.* at 141. Appellant, as heretofore stated, came voluntarily with the officers to the station, whereupon he was given, and subsequently waived, his *Miranda* rights. Appellant also had a prior criminal record. Appellant was of majority age and did not raise any issue of mental competency at the hearing. Although he was with the police for several hours, neither the questioning nor the atmosphere at the station house was overly coercive. The police did indeed say that alternative punishments could be imposed in some cases, but no promises or inducements were offered. Furthermore, there is no evidence of physical deprivation or mistreatment; appellant was allowed to go to the restroom, was provided cigarettes and coffee, and was told he could call his wife and have her come down. The record supports only a conclusion that the confession was not induced by duress or improper influences and, therefore, was voluntary and admissible. Appellant's contentions concerning his inculpatory statements are without merit.

## X

In advance of trial, appellant filed a motion *in limine* questioning the admissibility of testimony from state witness Herbert Spuhler. Subsequently, the motion was amended by the appellant to include the testimony of Ronald Humphrey, Sr. In support of the motion, appellant argued that the testimony of these state's witnesses should not be allowed as it was a product of a hypnotic process conducted during the investigation of the crime by Sheriff P. Phil Huff of Holmes County.

At the hearing on appellant's motion the sheriff testified that neither witness recalled any additional facts of importance as a result of hypnosis.[13] Nevertheless, the state agreed to limit the witnesses' trial testimony to their pre-hypnotic observations. The court tentatively resolved the evidentiary issue by overruling appellant's motion *in limine*.

---

[13] As is pointed out in the state's brief, the sheriff testified that prior to hypnosis he completed "paper work," including a preinduction interview of the state's witnesses. Prior to hypnosis, Humphrey explained what he had seen. The entire procedure was videotaped. Sheriff Huff testified that prior to inducing hypnosis the only fact he knew about the case was that there was a girl missing and that the police had a suspect. He asked not to be told any more. It appears that Spuhler recalled nothing new under hypnosis as his answers before and after hypnosis were basically the same. Apparently the only difference is that in Humphrey's post-hypnotic recall there is more detail regarding the appellant's automobile.

The appellant submits that the allowance of any testimony by these state witnesses at trial constituted error as it violated his rights to due process, effective assistance of counsel, and to confront witnesses, in that prior to trial the witnesses' memories had been hypnotically refreshed.

The appellate court noted that "[t]he pre-hypnotic recollection of both witnesses was independently established and their trial testimony limited thereto." The court dismissed the assignment of error by finding that appellant's objections concerned the weight of the evidence not its admissibility. We note that the record does not disclose any objection by appellant at trial concerning the issue of hypnotic testimony.

Motions *in limine* are discussed in some detail by a Texas appellate court in *Redding* v. *Ferguson* (Tex. Civ. App. 1973), 501 S.W. 2d 717. The *Redding* court notes at 722 that "[t]he purpose of a motion in limine is to avoid the injection into the trial, of matters which are irrelevant, inadmissible and prejudicial. * * * It also serves the useful purpose of raising and pointing out before trial, certain evidentiary rulings that the Court may be called upon to make. By its very nature, when properly drawn, its grant cannot be error. It is not a ruling on evidence. It adds a procedural step prior to the offer of evidence."

This analysis by Texas is in accord with Ohio's recent appellate court decisions in *State* v. *White* (1982), 6 Ohio App. 3d 1, and *State* v. *Wilson* (1982), 8 Ohio App. 3d 216, 219-220. The court in *Wilson* stated that "* * * if the trial judge had denied the motion *in limine* by ruling that the evidence was proper, counsel asserting the objection would have been obliged to challenge the evidence when the full context of the evidentiary issue was presented during the trial. Failure to object to evidence at the trial constitutes a waiver of any challenge, regardless of the disposition made for a preliminary motion *in limine.*" *Id.* at 220.[14] See, also, *Caserta* v. *Allstate Ins. Co.* (1983), 14 Ohio App. 3d 167, 170.

---

[14] The use of motions *in limine* in Ohio courts is ably synthesized by a passage from Palmer, Ohio Rules of Evidence, Rules Manual (1984), which provides at 446 in part:

"A motion *in limine* may be used in two different ways. First, it may be used as the equivalent of a motion to suppress evidence, which is either not competent or improper because of some unusual circumstance. Second, it may be used as a means of raising objection to an area of inquiry to prevent prejudicial questions and statements until the admissibility of the questionable evidence can be determined during the course of the trial. It is a precautionary request, directed to the inherent discretion of the trial judge, to limit the examination of witnesses by opposing counsel in a specified area until its admissibility is determined by the court outside of the presence of the jury. The sustaining of a motion *in limine* does not determine the admissibility of the evidence to which it is directed. Rather it is only a preliminary interlocutory order precluding questions being asked in a certain area until the court can determine from the total circumstances of the case whether the evidence would be admissible. When sustained, *losing counsel should make a proffer of the otherwise excluded evidence at the proper time during the trial and have a second determination or hearing by the court as to its admissibility.* * * *

"Although extremely useful as a trial technique, *the ruling in a motion in limine does not preserve the record on appeal.* The ruling is as [sic] tentative, preliminary or presumptive rul-

"An appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." *State* v. *Williams* (1977), 51 Ohio St. 2d 112 [5 O.O.3d 98], paragraph one of the syllabus, vacated in part on other grounds (1978), 438 U.S. 911. Appellant's failure to object at trial in the case *sub judice* constituted a waiver of this evidentiary issue.[15]

Nevertheless, we find that even if appellant had not waived this issue, the trial court's original determination on the motion *in limine* was correct.

At the outset it must first be recognized that the witnesses did not testify at trial while under hypnosis nor did they relay any hypnotically induced recollection. Rather, they testified about matters recalled and related prior to and independent of hypnosis. This court declines to hold that a prior hypnotic session should necessarily render a witness completely incompetent to testify at trial concerning events recalled independently of hypnosis. We agree that any credibility issue could properly be resolved by the trier of fact and assigned weight appropriately.

Appellant draws our attention to a recent Supreme Court of Arizona decision which ruled that hypnotically induced testimony is inadmissible. *State, ex rel. Collins,* v. *Superior Court* (1982), 132 Ariz. 180, 644 P. 2d 1266. Among the several reasons listed by the court in support of its decision is that such testimony denies the accused the right of confrontation. However, the *Collins* court in a subsequent supplemental opinion went on to provide that a previously hypnotized witness is allowed to testify about matters he recalled and related prior to hypnosis such as in the case *sub judice. Id.* at 209.[16]

---

ing about an evidentiary issue that is anticipated but has not yet been presented in its full context. An appellate court need not review the propriety of such an order unless the claimed error is preserved by an objection, proffer, or ruling on the record when the issue is actually reached and the context is developed at trial." (Emphasis added.)

[15] Appellant did not object at trial when the state called the witnesses to testify and thus deprived the trial court of the opportunity to reconsider the admissibility of the testimony. We agree with the *Wilson* court that failure to object to evidence at trial constitutes a waiver of any challenge, absent plain error affecting substantial rights of the defendant. See Evid. R. 103. Additionally, Crim. R. 52(A) provides that any error which does not affect substantial rights shall be disregarded. Appellant's claim that the testimony was crucial to the state's case is not well-founded in light of the other overwhelming evidence in the record. Further, appellant's counsel admitted all of the matters of substance testified to by both witnesses in his opening statement. Additionally, appellant admitted these issues by his confession.

[16] The issue of whether hypnotically induced testimony is admissible at trial is not presently before this court. Accordingly, we limit our approval of *Collins* to that portion of the supplemental opinion which holds that a witness is not incompetent to recall at trial matters which are substantially in conformance with his pre-hypnosis memory simply because he underwent hypnosis during the police investigation of the crime.

Accordingly, the overruling of appellant's motion *in limine* was proper.

### XI

Appellant next asserts that the trial judge improperly allowed the state to elicit prejudicial hearsay testimony from a defense witness on cross-examination.

Floyd Vasson, a former employer of appellant, was called as a defense witness during the guilt phase of the trial. On direct examination Vasson testified that he had been appellant's employer for a year and one-half during 1981 and 1982. Vasson testified that he was glad he had hired appellant, he had no problems with the appellant for a year, appellant had learned his job very well, and appellant had been a very good worker. He also testified on direct examination that he had to fire appellant for cause due to his drinking problem and that he "didn't want any trouble there."

In response to a question on cross-examination as to the cause of appellant's dismissal, the witness stated that appellant had a drinking problem and was loud. He further stated he had to dismiss the appellant because the "'* * * girls there were a little afraid * * *.'"[17]

Questioning continued on cross-examination concerning appellant's dismissal, drinking, and loudness. The state then sought to clarify the reasons why the witness terminated the appellant's employment:

"Q. In what way did he not conduct himself well?

"A. I don't know how to explain it. It's just loud or in front of me quite frankly nothing happened that much. It's when I wasn't there and I was told about it when I got back, okay, so I can't say that I witnessed him doing a lot of things that were all that bad, but you know, everybody that's working there can't really be telling fibs because they liked him.

"Q. Well what did they tell you he did?

"MR. MASTRIACOVO: Objection your honor.

"THE COURT: Overruled.

"A. Things like some of the girls were afraid of his advances and this type of thing.

"Q. You mean sexual advances?

---

[17] On cross-examination the prosecutor queried:

"Q. *Specifically, what did he do that caused you to fire him,* just what was the incident?

"A. Well when I walked in I noticed he had to be drinking.

"He was just acting . . . well he was kind of loud.

"Q. He was loud?

"A. Yeh, how you doing buddy and all this kind of stuff and I just told the girl that worked for me I said I've had it, I'm going out of here, I'll make a phone call and when he answers the phone if he acts up just walk out of the store everybody and leave him alone, but I *didn't want him around because many a times I was asked to come back because the girls there were a little afraid.*

"MR. MASTRIACOVO: Objection.

"THE COURT: Overruled. He's answered." (Emphasis added.)

"A.  Well comments.

"Q.  In other words he would make obscene or off color sexual comments to the female employees, is that correct?

"A.  Yes.

"Q.  And they told you about that?

"A.  Un hum."

Appellant contends that the trial court erred in admitting this testimony. Appellant asserts that the state was improperly allowed to elicit hearsay testimony concerning his character and reputation, as the testimony does not fit the requirements for the hearsay exception provided by Evid. R. 803(20).

To constitute hearsay, two elements are needed. First, there must be an out-of-court statement. Second, the statement must be offered to prove the truth of the matter asserted.[18] If either element is not present, the statement is not "hearsay." *Potter* v. *Baker* (1955), 162 Ohio St. 488 [55 O.O. 389]. See, also, *State* v. *Nabozny* (1978), 54 Ohio St. 2d 195, at 209 [8 O.O.3d 181], vacated on other grounds (1978), 439 U.S. 811. In *State* v. *Thomas* (1980), 61 Ohio St. 2d 223, 232 [15 O.O.3d 234], this court held that testimony which explains the actions of a witness to whom a statement was directed, such as to explain the witness' activities, is not hearsay. Likewise, it is non-hearsay if an out-of-court statement is offered to prove a statement was made and not for its truth, *Cassidy* v. *Ohio Public Service Co.* (1947), 83 Ohio App. 404, 410 [38 O.O. 460]; to show a state of mind, *Stewart* v. *State* (1850), 19 Ohio 302; or to explain an act in question, *Finnegan* v. *Metro. Life Ins. Co.* (App. 1958), 81 Ohio Law Abs. 417, 419-420.

Examples of non-hearsay under Evid. R. 801 can also be gleaned from the federal courts. In *United States* v. *Jackson* (C.A. 5, 1980), 621 F. 2d 216, the conviction of a defendant for making false bank entries was reversed in part because the trial judge refused to permit the defendant to testify to a conversation which, he claimed, would have shown that he did not know his entry was false. The evidence was not properly excluded as hearsay. It was offered not for its truth, but to show what the defendant was told and relied upon. See, also, *United States* v. *Leake* (C.A. 4, 1981), 642 F. 2d 715, and *United States* v. *Parry* (C.A. 5, 1981), 649 F. 2d 292. Likewise in *United States* v. *Rubin* (C.A. 5, 1979), 591 F. 2d 278, certiorari

---

[18] Evid. R. 801 provides in part:

"(A)  A 'statement' is (1) an oral or written assertion * * *.

"* * *

"(C)  'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

The Notes of Advisory Committee on Proposed Rules accompanying Fed. R. Evid. 801(c) explain non-hearsay as follows:

"If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."

denied (1979), 444 U.S. 864, the reviewing court reversed a conviction because evidence was erroneously excluded as hearsay when it was offered not for its truth, but to show what the defendant was told. The defendant's claim that what he was told, whether true or not, made his actions innocent was found relevant under Fed. R. Evid. 401 and 402 by the circuit court. *Id.* at 283.

Accordingly, if a statement is offered for some purpose other than to prove the truth of the matter asserted, admissibility should be governed by the standards of relevancy and prejudice. *Rubin, supra,* at 283. The issue herein therefore is not whether the testimony was hearsay but rather whether it was relevant.[19]

The issue concerning the cause for appellant's firing from his job was first brought out by defense counsel on direct examination. Evid. R. 611(B) allows for cross-examination as well as matters affecting credibility.[20] Appellant asserts that he did not offer evidence of his general good character or reputation, and thus the state should not have been allowed to put appellant's character into issue.

The court of appeals found that the witness was essentially a character witness. Our review of the entire testimony of this witness reveals little reason why appellant would have called this witness during the guilt phase of the trial other than to elicit favorable opinion testimony.

The subject of appellant's discharge from employment was introduced by defense counsel. A witness may be properly cross-examined as to all relevant facts developed by the examination in chief. *Smith* v. *State* (1932), 125 Ohio St. 137. Defense counsel put the reason for appellant's discharge

---

[19] Article IV of Ohio's Rules of Evidence provides in part:

Evid. R. 401:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Evid. R. 402:

"All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio. Evidence which is not relevant is not admissible."

Evid. R. 403:

"(A) Exclusion mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

"(B) Exclusion discretionary. Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence."

[20] Evid. R. 611(B) states:

"Cross-examination shall be permitted on all relevant matters and matters affecting credibility."

into issue. See, *e.g., State* v. *Muscatello* (1977), 57 Ohio App. 2d 231, 255 [11 O.O.3d 320], affirmed (1978), 55 Ohio St. 2d 201 [9 O.O.3d 148].

In any event, we find that the witness' testimony concerned his reasons for firing the appellant. His testimony was therefore admissible non-hearsay since it was offered not to prove that appellant made comments to co-workers but rather to demonstrate what factors prompted the witness-employer to discharge the appellant. The issue of appellant's dismissal was raised by appellant on direct examination and this follow-up testimony was probative in explaining the witness' action in response to the queries made of him by both parties. We find no error in the trial court's evidentiary ruling as, when balanced, we believe the relevancy and probative value of this testimony far outweighed any arguable prejudice to appellant. In light of the other overwhelming evidence, we find that this testimony did not contribute to appellant's conviction in any meaningful degree. *State* v. *Ferguson* (1983), 5 Ohio St. 3d 160, 166, at fn. 5; *Chapman* v. *California* (1967), 386 U.S. 18.

## XII

Appellant further argues that it was an abuse of discretion for the trial court to admit graphic photographs of the victim into evidence. The state introduced five photographs of the victim taken at both the burial scene and the autopsy room. Appellant's pretrial motion *in limine,* objecting to their admission, was overruled by the trial court as was counsel's objection at trial.

Appellant contends that the photographs were inadmissible under Evid. R. 403,[21] as their probative value was outweighed by the inflammatory and prejudicial effect on the jurors. Although he did not plead guilty, appellant asserts that the pictures were not relevant as defense counsel stipulated that appellant had caused the death of the victim.

The court of appeals indicates it gave careful consideration to the photographs. The court held that although the photographs were gruesome, their admission was not error in that they were properly identified, qualified and had probative value.

Under Evid. R. 403 and 611(A),[22] the admission of photographs is left to the sound discretion of the trial court. See *State* v. *Wilson* (1972), 30 Ohio St. 2d 199, 203-204 [59 O.O.2d 220] (autopsy photos). To be certain, a trial court may reject a photograph, otherwise admissible, due to its inflammatory nature if on balance the prejudice outweighs the relevant pro-

---

[21] See fn. 19, *supra.*

[22] Evid. R. 611 provides in part:

"(A) The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."

bative value. However, the mere fact that a photograph is gruesome or horrendous is not sufficient to render it *per se* inadmissible. *State* v. *Woodards* (1966), 6 Ohio St. 2d 14, 25 [35 O.O.2d 8]. "The trial court has broad discretion in the admission * * * of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere." *State* v. *Hymore* (1967), 9 Ohio St. 2d 122, 128 [38 O.O.2d 298].

We have held that "[t]he state must prove, and the jury must find, that the killing was purposely done. The number of shots fired, the places where the bullets entered the body, and the resulting wounds are all probative evidence of a purpose to cause death. The total probative value of these photographs was not outweighed by the danger of prejudicial effect upon the defendant." *State* v. *Strodes* (1976), 48 Ohio St. 2d 113, 116 [2 O.O.3d 271], vacated in part on other grounds (1978), 438 U.S. 911. Likewise, in *United States* v. *Kilbourne* (C.A. 4, 1977), 559 F. 2d 1263, an appellant's conviction for murder was affirmed when the court held that evidence of sexual relations with the victim was relevant to show motive and that the probative value was not substantially outweighed by the danger of prejudice. The *Kilbourne* court reached the same conclusion with respect to (1) photographs taken at the scene of the murder showing certain items linked to appellant and their proximity to the body, and (2) photographs taken at the morgue indicating the deliberate nature of the killing.

The fact that appellant stipulated the cause of death does not automatically render the photographs inadmissible. We agree with the Fifth Circuit Court of Appeals which noted that Fed. R. Evid. 403 requires a balancing analysis by the trial judge and held that a trial court could properly find that films had probative value above and beyond a defendant's stipulation. *United States* v. *Grassi* (C.A.5, 1979), 602 F. 2d 1192, 1197, vacated in part on other grounds (1980), 448 U.S. 902.

The Sixth Circuit Court of Appeals had a similar case before it in *United States* v. *Brady* (C.A. 6, 1979), 595 F. 2d 359. That case involved a bank robbery and homicides in which the defendant had stipulated the deaths had been caused by gunshot wounds. The prosecution introduced photographs of the bloody bodies lying on the floor. Interpreting an objection to these photographs under Fed. R. Evid. 403, the Sixth Circuit found that the photographs were admissible and went on to hold that relevant evidence, challenged as being outweighed by its prejudicial effects, should be viewed in a light most favorable to the proponent of the evidence, maximizing its probative value and minimizing any prejudicial effect to one opposing admission.

Additionally, we also find that the photographs were illustrative of the testimony of state witnesses concerning the burial site and expert forensic evidence concerning the elements of the offense charged. Such illustrative photographs are generally admissible.

In the case *sub judice* appellant has failed to demonstrate either an abuse of discretion by the trial court (see *Steiner* v. *Custer, supra,* at paragraph two of the syllabus) or material prejudice. Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative to testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number. The photographs herein, numbering five, were not so numerous so as to be repetitive or cumulative. They illustrated witness testimony and expert forensic evidence. The pictures also appear to have probative value concerning issues in dispute beyond defense counsel's stipulations. On balance, we find their relevancy and probative value substantially outweigh the danger of unfair prejudice to appellant. Evid. R. 403.

## XIII

Appellant next alleges that he was deprived of a fair and impartial trial because of the prosecutor's misconduct. He claims the prosecutor couched certain questions in such a way as to testify to matters not in evidence.

Ohio courts have suggested that the effect of counsel's misconduct "must be considered in the light of the whole case." See, *e.g., Mikula* v. *Balogh* (1965), 9 Ohio App. 2d 250, 258 [38 O.O.2d 311]. And where misconduct of counsel " '* * * is of such a prejudicial character that the prejudice resulting therefrom cannot be eliminated or cured by prompt withdrawal, and admonition and instructions from the court of the jury to disregard it, a new trial should be granted, or the judgment reversed, notwithstanding cautions, admonition, and instructions by the trial judge.' " *Book* v. *Erskine & Sons, Inc.* (1951), 154 Ohio St. 391, 401 [43 O.O. 334].

In general terms, the conduct of a prosecuting attorney during trial cannot be made a ground of error unless that conduct deprives the defendant of a fair trial. *State* v. *Papp* (1978), 64 Ohio App. 2d 203, 211 [18 O.O.3d 157]; *State* v. *Wade* (1978), 53 Ohio St. 2d 182, 186 [7 O.O.3d 362]; *State* v. *DeNicola* (1955), 163 Ohio St. 140, 148 [56 O.O. 185]; *Scott* v. *State* (1923), 107 Ohio St. 475, 490-491. This, then, is the point at which we begin in our analysis of this issue.

The instances cited by appellant which he claims constitute prosecutorial misconduct are as follows.

During the penalty phase of the trial, appellant called an expert witness, Gloria Sanders. She testified that appellant's I.Q. was 77. The prosecutor, on cross-examination, countered with a statement that appellant's I.Q. in 1978 had been 101. This report was not in evidence, and the prosecutor's remark offset appellant's assertion that he should not be put to death because he did not realize the full import of his actions. In other questions to this witness, the prosecutor "speculated" as to ap-

pellant's motivations for the murder, and his plans to escape from the Stark County jail. There was no other evidence on these matters. The prosecutor's methods were evidently designed to have the jury believe that appellant realized the full significance of his deeds and that appellant murdered the victim in cold blood.

Having recognized the prosecutor's transgressions, however, we are constrained to keep in mind that "[i]f every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the most experienced of counsel are occasionally carried away by this temptation." *Dunlop* v. *United States* (1897), 165 U.S. 487, 498.

Recently, in *State* v. *Smith* (1984), 14 Ohio St. 3d 13, we considered another case involving prosecutorial misconduct. We found at 14 that the prosecutor's personal attacks and accusations against defense counsel went so far beyond "the normal latitude allowed in closing arguments" that a fair trial was made impossible.[23] In *Smith,* the prosecution argued that its improper comments were harmless in view of the sufficiency of the evidence to sustain a conviction. It further contended that prejudice was eliminated because the jury was instructed that closing arguments were not evidence. In light of the circumstances of the case, we found these claims to be without merit, and held: "[T]he general instruction that arguments of counsel are not to be considered as evidence was insufficient to correct the error. * * * In view of the fact that improper insinuations and assertions of personal knowledge by the prosecution are apt to carry great weight against the accused when they should properly carry none * * * some more definite guidance from the court was required." *Id.* at 15.

Important to our disposition of the instant issue is our observation in *Smith* that "it is not enough that there be sufficient other evidence to sustain a conviction in order to excuse the prosecution's improper remarks. Instead, it must be clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found defendant guilty." *Id.*

Therefore, the crucial aspect of our analysis here is the effect of the prosecutor's statements on the jury's decision to recommend the death penalty. Whereas in *Smith, supra,* at 15, we could not state "beyond a reasonable doubt, that the jury would have found defendant guilty had there been no misconduct on the part of the prosecution," we have a different situation here. Even if the prosecutor had refrained from making his improper comments, we are convinced beyond a reasonable doubt that

---

[23] In *State* v. *Smith, supra,* the facts demonstrated that "the assistant prosecutor referred to defense evidence as 'lies,' 'garbage,' 'garbage lies,' '[a] smoke screen,' and 'a well conceived and well rehearsed lie.' In addition, the assistant prosecutor intimated that defense counsel had suborned perjury by manufacturing, conceiving and fashioning lies to be presented in court. There was no evidence to substantiate these accusations. Such conduct is well beyond the normal latitude allowed in closing arguments and is clearly improper."

the prosecutor's remarks concerning matters outside the evidence did not affect the jury's verdict in the penalty phase of appellant's trial.

As we discussed in Part III of this decision, this court has found, independent of the jury's recommendation, that the aggravating circumstance outweighs the mitigating factors and that appellant should receive the death penalty. Disregarding the prosecutor's challenged statements does not compel a contrary result, nor do we feel the jury would have recommended any differently. Accordingly, we reject appellant's contention that his death sentence be reduced because of prosecutorial misconduct.[24]

## XIV

Appellant next contends that comments made by the prosecutor during *voir dire* and in the closing arguments of the sentencing phase of the trial constitute prejudicial error.

During *voir dire,* the prosecutor asked one juror if she understood that "the court doesn't even have to follow your recommendation" of a sentence to be imposed. During closing argument in the penalty phase, the prosecutor said: "* * * Juries do not sentence. His Honor Judge McMonagle sentences. Juries recommend. They do not recommend on the basis of what they would like or what they wouldn't like. You do not have the ability to say we think this man ought to die in the electric chair. The law does not give you that ability. Nor do you have the ability to say we don't think he ought to die in the electric chair."

Defense counsel's objections to all of these remarks were overruled.

There is no question but that these comments were inaccurate in light of R.C. 2929.03(D) to the extent that had the jury imposed a life sentence, for example, that determination would have been binding upon the trial judge.

With respect to the prosecutor's *voir dire* questions, we find that appellant identifies and attacks only one episode involving only one juror. This juror was subsequently seated on the jury. Appellant neither challenged the seating of this juror for cause, nor did he exercise any of his peremptory challenges to prevent this juror from serving. We do not think appellant can now be heard to complain that the jury was prejudicially influenced by the prosecutor's questions. Since appellant could have taken corrective action, and did not, we decline to consider this issue. Cf. *State* v. *Williams, supra,* paragraph one of the syllabus.

We turn now to the prosecutor's alleged harmful comments in his penalty-phase closing argument.

---

[24] We are presented here with an issue similar to the one that we addressed in *State* v. *Williams* (1977), 51 Ohio St. 2d 112 [5 O.O.3d 98]. In that case, we held that "[t]he attempt to communicate by innuendo through the questioning of witnesses when the questioner has no evidence to support the innuendo is improper." *Id.* at 119. Nevertheless, as in *Williams,* "[u]pon consideration of the record," we conclude that error was harmless.

At the outset, we observe that "[c]onsiderable latitude is permitted in closing arguments, and the question is generally considered one falling in the first instance within the sound discretion of the trial court." *State* v. *Pustare* (1973), 33 Ohio App. 2d 305, 312 [62 O.O.2d 450]. This court, in *Golamb* v. *Layton* (1950), 154 Ohio St. 305 [43 O.O. 194], at paragraphs three and four of the syllabus, held:

"Although misconduct of counsel in argument to the jury is ever to be condemned, it does not always constitute grounds for ordering a mistrial or reversing a judgment. If the trial court promptly intervenes by admonition to counsel and appropriate instruction and it appears that a verdict for the party represented by such offending counsel is clearly justified by the evidence, the verdict may be allowed to stand.

"Such matters often rest in the sound discretion of the trial court and where it is apparent from the particular facts and circumstances of the particular case that such discretion has not been abused a reviewing court will not ordinarily interfere."

Our study of appellant's brief reveals no allegation or demonstration of abuse of discretion by the court in its conduct of closing arguments. Upon examination of the record, we likewise find none. So, we approach this issue by considering the possible detriment the prosecutor's misstatements had on appellant's case.

Closing arguments are not evidence. See *State* v. *Manago* (1974), 38 Ohio St. 2d 223, 227 [67 O.O.2d 291], at the footnote. The court in the guilt phase of this case so instructed the jury. In addition, the court also cautioned jurors that they were "to receive and accept the law as the court states it to be."[25] Likewise, in the sentencing portion of the trial, the judge said: "* * * You decide the disputed issues and *the court* provides you with the instructions of law. It is your sworn duty to accept these instructions and to apply the law *as it is now given to you by me*." (Emphasis added.)

We therefore find that while the prosecutor inaccurately stated the law in a single respect, the admonitions of the court in its charge to the jury remedied any detriment to appellant. Moreover, because the evidence against appellant was so overwhelming, any harmful effect of the prosecutor's comments paled by comparison. Pursuant to our holdings in

---

[25] In pertinent part, the judge said: "* * * It now becomes the duty of the court to state the law which governs this case. A related and equally important obligation rests upon the jury and that is to receive and accept the law *as the court states it to be* to adopt your guides throughout your deliberations, to apply it to the facts as you find the facts to be and then to render your verdict accordingly. Now this your [*sic*] *required to do regardless of any notions you may ever have as to what the law is, what the law ought to be.* It also follows in strict keeping with your oath to refuse absolutely to be moved, swayed or influenced by consideration such as sympathy for or bias or prejudice against either the State of Ohio or the defendant in this case." (Emphasis added.)

*Golamb* v. *Layton, supra,* we find appellant's argument to be destitute of merit.[26]

### XV

Appellant next challenges the trial court's refusal to instruct the jury on the crime of abduction in addition to kidnapping, an offense for which, among others, the appellant was indicted and tried. Appellant contends that such refusal denied him a fair trial and violated his right to due process of law.

Crim. R. 31(C) provides, in pertinent part, that "if lesser offenses are included within the offense charged, the defendant may be found not guilty of the degree charged but guilty of an inferior degree thereof, or of a lesser included offense." See, also, R.C. 2945.74.

One of the primary differences between kidnapping and abduction involves the offender's mental culpability. Kidnapping involves a *purposeful* removal or restraint, R.C. 2905.01,[27] while abduction involves a *knowing* removal or restraint, R.C. 2905.02.[28] The facts in this case could prove the appellant guilty of either of these offenses.

In *State* v. *Jenkins, supra,* we held that "the burden is on the defendant, once the state has presented its evidence on the substantive elements of the crime charged, to show a defense to certain elements of that offense and thereby obtain an instruction to a lesser included offense." *Id.* at 219. In *State* v. *Solomon* (1981), 66 Ohio St. 2d 214 [20 O.O.3d 213], at paragraph two of they syllabus, we held, in part, that "an instruction on a lesser included offense should be given to the trier of fact only if, based on the evidence adduced by the state, the trier of fact can find for the defendant and against the state on some element of the greater offense which is not required to prove the commission of the lesser offense and for the state on the elements required to prove the commission of the lesser offense."

Appellant has not directed our attention to anything in the record which would have constituted a defense to any of the elements of kidnapping. We have likewise failed, upon our examination of the proceedings, to

---

[26] The issues we consider here are distinguishable from those presented to us in the recent case of *State* v. *Smith, supra.* In *Smith,* the prosecution made personal attacks against defense counsel. See fn. 23, *supra.* In the case at bar, we deal not with personal attacks, but with incidental misstatements of law. Any prejudice resulting from these misstatements, as we have said, was alleviated by the court's cautionary instructions.

[27] See fn. 2, *supra.*

[28] R.C. 2905.02, proscribing abduction, reads in part:

"(A) No person, without privilege to do so, shall knowingly do any of the following:

"(1) By force or threat, remove another from the place where he is found;

"(2) By force or threat, restrain another of his liberty, under circumstances which create a risk of physical harm to the victim, or place him in fear;

"(3) Hold another in a condition of involuntary servitude."

discover any such defense. In our view, the jury could not reasonably find in appellant's favor on any element of kidnapping. Therefore, pursuant to our holdings in *Jenkins* and *Solomon, supra,* we find that appellant, at trial, did not meet his burden of showing a defense to one of the substantive elements of kidnapping. Consequently, he was not entitled to an instruction on the lesser included offense of abduction. It follows that appellant's allegation that the trial judge erred in this regard is groundless.

## XVI

Appellant next contends that there was insufficient evidence, as a matter of law, to find specific intent to kill. He further alleges that the verdict of guilty was against the weight of the evidence.

While we have already held that a special jury verdict as to specific intent to kill is not required in a capital case, see Part V, *supra,* specific intent is nevertheless required to justify a conviction for aggravated murder. R.C. 2903.01(D) states, in pertinent part that "[n]o person shall be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another."

Appellant acknowledges that the standard to be used in cases of this kind is proof of guilt beyond a reasonable doubt. R.C. 2901.05(A); *In re Winship* (1970), 397 U.S. 358 [51 O.O.2d 323].[29] We have previously determined that Ohio's reasonable doubt standard, R.C. 2901.05(D),[30] is constitutional. *State* v. *Nabozny, supra,* at paragraph two of the syllabus. We reaffirm that holding.

In view of the evidence presented in the case at bar, it is but a remote possibility that the jury could have found *any* reasonable doubt as to appellant's guilt and his specific intent to murder Dawn Marie Hendershot.

After appellant was taken into custody and given *Miranda* warnings, the Massillon police conducted a tape-recorded interrogation. In the course of their questioning of the appellant, the following colloquy occurred:

"Det. Wilson: Okay, so you got scared and then you realized that you couldn't let her go, so is that why you killed her or attempted at that time to kill her?

---

[29] "Lest there remain any doubt about the constitutional stature of the reasonable doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship, supra,* at 364.

[30] R.C. 2901.05(D) defines "reasonable doubt" as follows:

" 'Reasonable doubt' is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. 'Proof beyond a reasonable doubt' is proof of such character than an ordinary person would be willing to rely and act upon it in the most important of his own affairs."

"Donald Lee Maurer: Yeh.

"Det. Wilson: All right, at first how did you try to kill her?

"Donald Lee Maurer: I tried to strangle her with her sweater.

"Det. Wilson: Okay, and what was she doing or [sic] while this was taking place?

"Donald Lee Maurer: Trying, struggling a little bit.

"Det. Wilson: Okay, was she screaming?

"Donald Lee Maurer: No.

"Det. Wilson: Was she fighting with you a lot or what?

"Donald Lee Maurer: Just struggling a little bit.

"Det. Wilson: Okay, then after you attempted to strangle her what did you do?

"Donald Lee Maurer: I gave, quit doing it and I picked up the rifle and then I shot her in the back.

"Det. Wilson: Okay, * * * where was she when you shot her in the back?

"Donald Lee Maurer: Laying [sic] beside the log.

"Det. Wilson: Okay, what did you shoot her with?

"Donald Lee Maurer: A 12 gauge shotgun with a 12 gauge rifle slug."

In the face of this, appellant claims in his brief that "[t]hroughout his statement, Maurer denies intending to pick up Dawn Hendershot, denies intending to molest her, and denies intending to kill her." This assertion is utterly without foundation, and, accordingly, appellant's contention is utterly without merit.

## XVII

Last, appellant contends that the court of appeals refused to consider several errors raised on appeal which it erroneously concluded had not been preserved by objection at trial. We need not address the merits of this argument inasmuch as we find it is premised upon an incorrect characterization of the court of appeals' opinion.

Although in each assignment of error specified by appellant the court made a finding that proper objection was not made at trial, it went further and also considered the merits of the argument. Moreover, the issues raised in each challenged assignment have been raised and addressed in this appeal.

## XVIII

In conclusion, we uphold the conviction and death sentence of this appellant. As in the decision in *State* v. *Jenkins, supra,* we are completely satisfied that sustaining appellant's convictions and death sentence results in the fair and proper administration of justice to all concerned and that appellant received an objective, impartial, and unprejudiced review at each stage of these proceedings.

Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

SWEENEY, LOCHER, C. BROWN and J. P. CELEBREZZE, JJ., concur.

W. BROWN and HOLMES, JJ., concur in the syllabus and judgment only.