The State of Ohio, Appellee, *v.* Pustare, Appellant.

[Cite as State v. Pustare (1973), 33 Ohio App. 2d 305.]

306

(No. 30731—Decided April 5, 1973.)

*Mr. John T. Corrigan,* prosecuting attorney, and *Mr. Harvey R. Monck,* for appellee.

*Mr. Seymour A. Terrell* and *Mr. Martin A. Rini,* for appellant.

SILBERT, J. This is an appeal from a conviction of murder in the first degree, with a recommendation of mercy. The deceased, one Amelia Sambula, was gunned down a short distance from her home while returning from work in the early evening of Saturday, November 22, 1969. She was seventeen years of age, and in the 11th grade.

Appellant admits witnessing the killing. He claims that he pursued the killer, abandoning the chase only when he himself was threatened by the assailant. There were no other witnesses to the shooting, but several people did see the appellant run from the general area just after the shots were fired. They saw, or heard, no one else.

Appellant returned home sweating heavily, put away a gun he had been carrying, used the bathroom, got a drink of water, and may have changed jackets. He then returned

to the scene, sought out the police, and offered to help. The police took down his name and home address. He left after telling them he would be home in a half-hour to forty-five minutes, and he went to a neighborhood bar where he ordered the strongest drink in the house.

As he tells the story, he returned home just in time to see a police car pulling away from the curb. He ran up, identified himself, and invited the officers into his home. He freely discussed what he said he had witnessed. At one point he disappeared into his bedroom, producing several of his own guns, which he compared to the gun he claimed the assailant was carrying. Among the guns was a short nosed, Smith and Wesson, .38 Special.

The police asked appellant if he would go with them, and talk to the detectives who had been assigned to the case. He agreed to go. They had just reached the car when one of the patrolmen said he had misplaced some of his notes. Appellant went back inside to look. They were not in the house. When he returned to the car, the patrolman said he had found them.

After returning to the scene of the crime, appellant was introduced to the detectives. He showed them how the assailant fled, told them he thought two employees of a nearby supermarket had witnessed what had happened, and volunteered that he thought he knew one of them. Again he described the killer: 28 to 35 years of age, 5'10" to 6' in height, weighing 185 to 200 pounds. Appellant was himself 28 years old, 5'10" tall, and weighed about 200 pounds.

The detectives asked appellant if he would be willing to go downtown to view photographs of possible suspects. He said he would. They stopped at Euclid-General Hospital, and it was there that one of the patrolmen remembered to give them a projectile removed from Amelia's body —a .38 caliber, half-copper jacketed, hollow point bullet.

Appellant's first two assignments of error are interrelated. He complains (1) that the trial court erred in overruling his motion to suppress evidence, specifically, the .38 caliber weapon he displayed to the officers in his home, ballistically identified as having been used to kill the deceased, and (2) that the trial court erred in that he was

denied assistance of counsel before consenting to the seizure of that weapon.

The detectives are steadfast in maintaining that insofar as they were concerned appellant was only a witness until after they had arrived at their offices, and that suspicion did not ripen until the appellant himself suggested that they run ballistic tests on his guns to clearly establish his innocence. They then decided that they had best warn him of what he was doing, and they duly administered the *Miranda* warnings. Appellant admits this was done, claims it was the police who first suggested that the one way he could clear himself was to allow them to examine his guns, and insists that he asked for, and was denied counsel. The detectives are adamant in their insistence that he never asked for a lawyer even though he clearly stated that he fully understood the rights explained to him.

At the hearing on the motion to suppress, appellant attempted to suggest that his going back into the house was but a clever ruse intended to allow the officers to consult privately, that suspicion had already attached. His own testimony disputes this theory—he volunteered to go back after one of the patrolmen started in. The officers permitted him to go even though that necessarily meant he would be out of their sight, and therefore, custody.

The police did not then seize the guns. They were obtained only after appellant was warned of his rights. At that time he called home, and talked to both of his sisters. It would have been natural to have turned to them in time of trouble. He did not ask them for help. He told them the police were sending someone out for the guns, and persuaded them to cooperate by telling them that a ballistics test would clear him.

Appellant lived with his sister, Ruth, and his mother. Ruth Pustare owned the house. She freely admitted the police when they arrived, and showed them the guns which she had unloaded and laid out on the kitchen table. She even gave them a bag to carry the guns in, because she was afraid they might drop them.

Appellant does not claim the police elicited an invol-

untary confession, or otherwise obtained poisoned information upon which they have built their case. Quite the contrary. Evidence of several one-on-one confrontations was used in an attempt to bolster his story by showing that he consistently held to it. He insists he told the police from the outset that he had fired a gun that evening, a foolish thing to have done, he admits, firing it into the ground just for the lark, or to test some new ammunition. The police claim he first mentioned firing the weapon only after they suggested a firearms residual test be performed, or just after it was completed. This, they say, had much to do with their decision to actually hold him. Appellant could not then have known that the test results, in fact, were negative.

*Miranda* v. *Arizona* (1966), 384 U. S. 436, 16 L. Ed. 2d 694; *Escobedo* v. *Illinois* (1964), 378 U. S. 478, 12 L. Ed. 2d 977, and their progeny, were meant to protect a suspect from his accusers. They do not wholly protect him from himself.

"* * * There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make." *Miranda* v. *Arizona, supra,* at 478.

It is true that the particular sacredness of the right to counsel demands a scrupulous review of the record. We have done that. But in the final analysis it is the trial court that views the witnesses and bears the responsibility of determining the facts on a motion to suppress. It found that the search and seizure was consented to. We have no reason to disturb that finding. It was entirely within its province to believe the story as related by the police, not as given by the appellant—to believe that appellant was not indeed a suspect until after he had arrived at the homicide office, that he was given timely notice of his rights, including an offer of counsel, but that he intelligently and understandingly rejected the same, and chose instead to cooperate, because he was bluffing, or for some other reason known only to himself. The facts suggest other grounds

which would have justified, even required, the same result. Appellant's first and second assignments of error must be, and are, overruled.

As his third assignment of error, appellant contends the trial court should have granted his motion to dismiss the charge of first degree murder, offered at the close of the state's case, allowing the case to continue only on a charge of murder in the second degree. By that time the state had presented substantial evidence, which, if believed, would have established: (1) that Amelia Sambula died as a result of five bullet wounds inflicted within the City of Cleveland, and Cuyahoga County, (2) that the defendant was at the scene of the crime at the time she was shot, (3) that he was armed, and (4) that a weapon belonging to him, and his ammunition, matched the several projectiles removed from the body of the deceased. But that was not all.

Had the case then been submitted to the jury it would have had before it: (1) two tablets of paper Amelia Sambula died clutching in her hand, (2) the gun alleged to have been the murder weapon, (3) the projectiles removed from Amelia's body and clothing, (4) two loaded cartridges found in appellant's ammunition belt, and (5) a series of photographs taken by the coroner's office, depicting the fatal wounds. The evidence indicated that the two cartridges and the ammunition used to kill the deceased were of a type that would separate on impact. The assailant was seen following just ten feet behind Miss Sambula before the shots were heard. He started running in the direction she was walking just as the witness' view was obstructed, preventing him from seeing what followed.

Little time intervened between the time the assailant caught up with the deceased and the time the shots were heard. Appellant would have this court believe that the very shortness of this interval precludes any conclusion that the shooting was deliberate and done with premeditation. We think quite the contrary is true. The less time intervening, the less likely that the shooting was only conceived on the moment and in the heat of passion. There was no reason to believe that the defendant and the deceased were personally acquainted. There was good reason to believe

they were not. One does not unconsciously go about the street wearing a holster and ammunition belt and armed with a .38 caliber pistol. People do not just walk up and kill total strangers spontaneously.

It has not escaped our notice that the one witness called by the state on its case-in-chief who could clearly recall that five shots had been fired was equally certain that they had been fired in two bursts—that three shots were fired in rapid succession, followed by a short pause, followed by the last two shots. Appellant's .38 caliber weapon held five shots. He was an experienced marksman.

The coroner's testimony, the photographs, and damage to one of the two paper tablets indicates that two of the shots were fired while Miss Sambula was half facing or turning away from her assailant. One of these shots struck her in the center of her chest, passing through her right breast and exiting under her right arm. The other hit her on the inside of her right wrist and exited perhaps two-thirds of the way up her arm on the outside. A third shot was fired into the left side of the left half of her back. The other two shots struck her along the middle of the right side of her back.

In our view there was sufficient evidence to support a finding, *prima facie,* that the defendant had previously decided that he would kill Amelia Sambula outright, or that he would kill her if she failed to accede to his demands. His apparent method in brutally destroying her life strongly militates against any conclusion save that he took conscious measure of his heinous purpose. *Cf., State* v. *Stewart* (1964), 176 Ohio St. 156, 161-162. The third assignment of error is overruled.

In appellant's fourth assignment of error, he complains that a mistrial should have been granted because the prosecutor appealed to the jury's fears about the safety of their community. Perhaps it would have been better had the statement been omitted altogether, but appellant presents it out of context. Taken in context it was but an appeal to the jury to carefully weigh the evidence and to do the proper thing, not necessarily that which was easy. In substance the prosecutor appealed to the jury to return

a verdict that was fair to the state as well as the defendant. Considerable latitude is permitted in closing arguments, and the question is generally considered one falling in the first instance within the sound discretion of the trial court. See, *e. g., State* v. *Auerbach* (1923), 108 Ohio St. 96, 104. We do not believe that the trial court abused its discretion in refusing appellant's motion. The fourth assignment of error is overruled.

Appellant's fifth assignment of error is likewise without merit, and is overruled. It is true that in charging the jury the trial court stated that appellant had been permitted to withdraw his plea of not guilty by reason of insanity. Appellant himself opened the door. Counsel alluded to this plea in their opening statement, so that there was surely no impropriety or prejudice in the court's matter of fact statement that this matter was no longer before the jurors, and that they should not consider it.

Nor is there any merit to appellant's sixth assignment of error, *i. e.,* that the verdict and judgment are against the weight of the evidence and contrary to law. The state's *prima facie* case was considerably strengthened during the course of appellant's presentation of his defense, and on rebuttal.

To be sure, the defendant presented his own version of the story. He called a long list of witnesses to testify to his character. Ruth Pustare was permitted to give her own idea of what transpired, including what she claimed she experienced in a vision as a clairvoyant.

Nevertheless, it was brought out that the appellant was not in the habit of carrying a gun on his person and that the ammunition used was not the kind of ammunition he ordinarily used for target shooting, but was more powerful. The prior testimony that the shots were fired in two bursts was convincingly reinforced by the testimony of another neighbor with professional shooting experience. Five empty casings were produced. All were shown to have been discharged by the alleged murder weapon.

Appellant's counsel attempted to discredit the ballistics evidence. A careful reading of the expert testimony shows that they were not very successful. The jury did not agree with them, and we find their contentions unpersua-

sive. Their argument finds its only support in their own suggestive questioning on their cross-examination of the state's expert witness, hypothetical weaknesses largely refuted by the answers given. An expert of their own choosing was permitted to examine the evidence. They chose not to call him. The sixth assignment of error is overruled.

Appellant's seventh assignment of error is added by a supplemental brief filed in this court. Thus only now does he complain that the grand jury's indictment is ineffective because it was returned by a special grand jury even though the regular grand jury was then sitting. Assuming, *arguendo*, that the defect would be jurisdictional, and that it is of such a nature that even so it cannot be waived, we simply do not read the statutes as appellant apparently does.

The special grand jury was convened by the common pleas court as a result of a particularly heavy press of business then coming before the regular grand jury. R. C. 2939.04 relates, in part, to costs, but it also specifically provides that

"* * * The court of common pleas may order the drawing of a special jury to sit at *any* time public business requires it." (Emphasis added.)

These provisions have nothing to do with the drawing of a special grand jury pursuant to R. C. 2939.17. The latter provides for the impanelling of a second grand jury where the regular grand jury has been dismissed. The legislature's purpose and the efficacy of R. C. 2939.04 would be wholly defeated were the two sections read together and so narrowly construed as to require that only one grand jury may sit at any one time. Both sections were intended to afford timely and adequate consideration of all business coming before the grand jury, and we construe them accordingly. Appellant's seventh assignment of error is overruled.

*Judgment affirmed.*

KRENZLER and COOK, JJ., concur.

COOK, J., of the Eleventh Appellate District sitting by designation in the Eighth Appellate District.