DECISION AND JOURNAL ENTRY
Defendant, Clarence Elkins, has appealed from his convictions for murder, attempted aggravated murder, rape, and felonious assault. We affirm.
On June 10, 1998, Defendant was indicted on one count of aggravated murder, in violation of R.C. 2903.01(A)/(B) with three death penalty specifications; one count of attempted aggravated murder, in violation of R.C. 2903.01(B)/2923.02; one count of rape, in violation of R.C. 2907.02(A)(2); two counts of rape, in violation of R.C. 2907.02(A)(1)(b); and one count of felonious assault, in violation of R.C. 2903.11(A)(1). On April 22, 1999, a supplemental indictment was filed charging Defendant with one count of aggravated murder, in violation of R.C. 2903.01(A), with three death penalty specifications; and one count of aggravated murder, in violation of R.C. 2903.01(B), with three death penalty specifications. On June 7, 1999, upon motion by the prosecution, two of the counts of aggravated murder with all specifications were dismissed and specification three to the remaining count of aggravated murder was dismissed.
Following a jury trial, Defendant was found not guilty of aggravated murder, but guilty of the lesser-included offense of murder; guilty of attempted aggravated murder; guilty of all three counts of rape; and guilty of felonious assault. Defendant was sentenced to fifteen years to life imprisonment for the charge of murder, ten years imprisonment for attempted aggravated murder, ten years for one count of rape, and life imprisonment for each of the two counts of rape with force charges. The charge of felonious assault was merged into the attempted aggravated murder charge. All sentences are to run consecutive to each other. Defendant was further adjudicated to be a sexual predator. Defendant timely appealed and has raised five assignments of error for review. The assignments of error have been rearranged for ease of discussion.
 ASSIGNMENT OF ERROR V The jury verdict finding [Defendant] guilty was against the manifest weight of the evidence in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.
In his fifth assignment of error, Defendant has argued that his conviction was against the manifest weight of the evidence. We disagree.
A manifest weight challenge questions whether the State has met its burden of persuasion at trial. State v. Thompkins
(1997), 78 Ohio St.3d 380, 390 (Cook, J., concurring). In making this determination, we do not view the evidence in the light most favorable to the prosecution. Instead, we must:
 review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
State v. Otten (1986), 33 Ohio App.3d 339, 340. The discretionary power to grant a new trial should be exercised only in exceptional cases where the evidence weighs heavily against the conviction. Id.
Defendant was convicted of murder, attempted aggravated murder, rape, and felonious assault arising out of incidents that occurred on or about June 6-7, 1998. The testimony and evidence presented at trial supports Defendant's convictions for these charges.
On June 6, 1998, Judith (Judy) Johnson took her granddaughter Brooke to a birthday party for a family member. Following the party, Judy and Brooke went to the home of Patricia Abbott, and spent the evening with Patricia and her daughter Julie. Following an evening of socializing with the Abbotts, Julie drove Judy and Brooke home to Judy's house. Judy was legally blind and cannot drive. Due to the lateness of the hour that they were returning home, Judy decided to just keep Brooke at her house overnight.
Upon arriving at Judy's home, Judy entered the home alone, leaving Brooke in the car with Julie. Judy searched the home to make sure it was safe, turned on all of the lights in the house and then came out and retrieved Brooke from the car. Judy and Brooke then entered the home and Judy locked the door. Judy then opened a window to tell Julie that all was secure and she could leave. At approximately midnight, Judy spoke with Patricia on the phone and notified her that they arrived home safely, everything was secure, and they were going to bed.
In the early morning hours of June 7, 1998, between approximately 2:30 a.m. and 5:30 a.m., an assailant entered Judy's home. There were no signs of a forced entry. Judy was approached by the assailant close to the door. The assailant struck her repeatedly using a cylindrical object. Judy backed away trying to defend herself. The assailant continued to strike her, eventually knocking her to the chair in the living room. At this point Judy was killed by strangulation caused by compression of the neck. Judy was then thrown onto the living room floor and raped both anally and vaginally with a blunt object.
Following the attack on Judy, Brooke was punched in the face by the assailant. Brooke was then raped with a blunt object and strangled to the point of unconsciousness with a piece of rope as evidenced by ligature marks around Brooke's neck.
In the early morning hours after the attacks, Brooke regained consciousness and attempted to call for help. She placed two phone calls but neither individual was home. Brooke then went to a neighbor's house. The neighbor answered the door and found Brooke wearing a bloody robe and her jaw swollen. The neighbor described Brooke as hysterical. When the neighbor asked Brooke what had happened, Brooke grabbed the woman around the waist and told her that Judy was dead and Defendant had killed her. In fact, Brooke repeatedly told the neighbor that "[m]y Uncle Clarence killed my grandma."
The neighbor drove Brooke home to her parents. After she informed Brooke's parents of what Brooke had said happened, Brooke's father immediately left the house and went to Judy's home to see what had transpired. Brooke's father called the police from Judy's home and summoned them to the scene of the crime. The police subsequently came to Brooke's home and spoke with her and her mother. Brooke told the police officer that Defendant had done this. Brooke was then taken to Barberton Hospital for examination.
At Barberton Hospital Dr. Cindi Croft spoke with Brooke to obtain a medical history and examined her. Brooke told Dr. Croft that Defendant had punched her in the face. During her examination of Brooke, Dr. Croft determined that Brooke had been sexually assaulted and made arrangements for Brooke to be transported to Akron Children's Hospital. Upon arrival at Akron Children's Hospital, Brooke was directed to the CARE Center, the part of the hospital devoted to dealing with the evaluation of children who have been abused or assaulted in some way. Following an initial exam to determine Brooke's vital signs, Dr. Marla Kantaras, the pediatric resident assigned to Brooke; Detective Matthew Hudak, a Barberton police officer; and Daren Marshall, the social worker assigned to Brooke; met with Brooke to obtain a medical history. All three individuals met with Brooke collectively so as to avoid asking her questions repeatedly and to prevent added stress and trauma from being inflicted upon the young victim. Dr. Kantaras testified that the purpose of the questioning was to "find out what the extent of her injuries were, where she was hurting, and also to find out what had happened so that we would be able to treat her better."
During the course of the interview, Brooke stated that Defendant had punched her and identified Defendant as the individual who had hurt her and her grandmother. Brooke stated that she saw Defendant in the kitchen that morning. She then said that she remembered waking up that morning and being afraid that Defendant would come back. She then recounted that her grandmother was lying on the floor bleeding and not breathing. She stated that she had tried to help her, but was unable to. She also recounted her efforts to obtain help as far as calling a neighbor and walking to another neighbor's home.
Following the interview with Brooke, an extensive exam was undertaken to determine the extent of her injuries. The medical personnel determined that Brooke had a great deal of trauma to her face, ligature or strangulation marks around her neck, a tremendous amount of injury to the vaginal area both internally and externally in the form of bruises and lacerations, and bruising of the anal canal. Brooke required surgery to repair the vaginal injuries. Dr. Richard Steiner, the physician in charge of the CARE unit, testified that the vaginal and anal injuries were caused by forceful penetration of a blunt object that was jagged and hard.
On June 15, 1998, Robin Tener, a child psychologist met with Brooke for counseling upon referral from the Barberton Police Station. Brooke told Ms. Tener about what had transpired with her grandmother. She recounted that Defendant had killed her grandmother and struck her in the face. She further stated that he had hid the phone to keep her from calling the police. Brooke then told Ms. Tener that Defendant had hurt her and she needed stitches in her bottom because of this. Brooke subsequently met with Ms. Tener on three separate occasions. During these counseling sessions, Brooke told Ms. Tener that she remembered going to bed at her grandmother's house and described being put to bed in her grandmother's room. She stated that she awoke in the middle of the night and saw Defendant in the kitchen retrieving a knife. When he turned and saw her, she ran and hid in the bedroom. Brooke told Ms. Tener that she saw her grandmother lying on the floor. Brooke stated that "He hit me, my head was hurting." She then said she did not remember anything else until she woke up the next morning. She described finding her grandmother the following morning and said that there was blood everywhere. Brooke also recounted for Ms. Tener her actions in trying to get help for her grandmother. Upon questioning, Brooke admitted that she could not say for certain that it was a knife in Defendant's hands, but she remembered him standing in front of the drawer where the knives were kept and the noise associated with opening that drawer. Ms. Tener stated that Brooke never had any confusion or hesitancy about who the assailant had been that night.
In November 1998, Brooke's mother took Brooke to see Dr. Dawn Lord, a psychologist who specializes in treating children in the areas of trauma and abuse. Brooke told Dr. Lord that she had spent the night at her grandmother's house on the night in question. She said that she woke up because she had heard an argument between her grandmother and Defendant over money. Brooke described for Dr. Lord the manner in which her grandmother was assaulted and described the tool used as a metal implement. She then told Dr. Lord that her grandmother was assaulted between her legs. She then stated that she ran back into the bedroom and tried to hide. She stated that Defendant then came into the bedroom and pulled her nightgown up over her head and assaulted her between her legs. She said that she played dead to get him to stop. Following her interviews with Brooke, Dr. Lord diagnosed Brooke as having posttraumatic stress disorder.
At trial, Brooke testified that on the night of the attack a noise woke her up. She said that she went into the kitchen and saw Defendant with a long brown and silver item in his hands. She said that she then saw her grandmother in the living room on the floor. She then ran back to the bedroom and hid. She stated that Defendant punched her in the face. Brooke indicated that she didn't remember anything after that until she woke up the next morning. She then testified regarding her actions in trying to get help.
Several witnesses also testified at trial that Judy was afraid of Defendant and that they had previously argued. The witnesses established that the causes of the arguments were over money and the marital discord that existed between Defendant and Judy's daughter, Melinda (Mindy) Elkins. These witnesses testified that Defendant and Mindy had frequently separated and during these separations, Mindy had stayed with her mother. Further, these witnesses established that Judy had received threatening phone calls in the weeks leading up to her death. Patricia Abbott testified that she was present for one of these phone calls and during the course of the call, Defendant had threatened Judy.
At trial, Defendant presented numerous witnesses who testified that he was at various bars until 2:30 a.m. on the morning in question. Defendant then presented the testimony of a neighbor girl who stated that Defendant had arrived home at 2:40 a.m. Mindy, Defendant's wife and Judy's daughter, stated that after Defendant arrived home from the bars, they talked for a little while and then Defendant went to bed at approximately 3:10 a.m. She saw him in bed at 3:45 a.m., between 4:30 and 5:00 a.m., and then again at 8:00 a.m. Mindy further testified that Defendant's car keys were located in his coat pocket and were inaccessible to Defendant without her having seen him. Mindy admitted that she and Defendant had separated on two occasions during their marriage, but claimed that both instances were short lived and that they enjoyed a happy marriage. She also testified that Defendant showed a great deal of respect for her mother and that he had never threatened or harassed her.
Upon review of the evidence, Defendant's convictions are not against the manifest weight of the evidence. Brooke placed Defendant at her grandmother's home during the attack and identified him as the perpetrator of the crimes in question. Although the child was young at the time of the attack, she has consistently stated that Defendant killed her grandmother and assaulted her. Additionally, there is a complete lack of evidence to indicate that she made such statements under influence from others. While Defendant sought to establish an alibi for the time of his murder, the jury could have chosen not to believe the testimony of his wife.
This Court may reverse a conviction and order a new trial only in the exceptional case where the evidence weighs heavily in favor of Defendant. State v. Otten, 33 Ohio App.3d at 340. Upon review of the evidence, this is not such a case. Accordingly, Defendant's contention that his convictions were against the manifest weight of the evidence is without merit. His fifth assignment of error is overruled.
 ASSIGNMENT OF ERROR I The trial court erred in admitting hearsay testimony that did not fall within Ohio Rule of Evidence 803(2) thereby denying [Defendant] a fair trial.
In his first assignment of error, Defendant has argued that the trial court erred by permitting hearsay statements to be made that did not properly meet the excited utterance exception enumerated in Evid.R. 803(2).
Under Evid.R. 803(2), "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is admissible despite its hearsay nature. To qualify as an excited utterance or spontaneous exclamation, the statement must meet a four-part test:
 (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective,
 (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination continued to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs,
 (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and
 (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration.
(Emphasis sic.) State v. Wallace (1988), 37 Ohio St.3d 87,89, quoting Potter v. Baker (1955), 162 Ohio St. 488, paragraph two of the syllabus.
When reviewing the trial court's decision regarding admissibility under Evid.R. 803(2), we do so under an abuse of discretion standard. State v. Apanovitch (1987), 33 Ohio St.3d 19,25; see, also, Potter, 162 Ohio St. at 499-500. An abuse of discretion is not a mere error of judgment, rather it is "perversity of will, passion, prejudice, partiality, or moral delinquency." See State ex rel. Shafer v. Ohio Turnpike Comm.
(1953), 159 Ohio St. 581, 590-591.
Defendant has pointed to six instances in which he argues that the trial court improperly admitted evidence under the excited utterance exception to the hearsay rule delineated in Evid.R. 803(2). Each statement will be addressed below.
The first statement Defendant assigns as erroneously admitted is where Patricia Abbott, a friend of Judy, testified that Judy had told her about an instance where Defendant held a gun to Judy's face and informed her that she would not break up the marriage between himself and Judy's daughter. Defendant has argued that the lapse of time between the incident and the statement being made makes the excited utterance exception inapplicable. While the passage of time between the statement and the event is relevant, it is not dispositive of the question. "[E]ach case must be decided on its own circumstances, since it is patently futile to attempt to formulate an inelastic rule delimiting the time limits within which an oral utterance must be made in order that it be termed a spontaneous exclamation." Statev. Duncan (1978), 53 Ohio St.2d 215, 219-20. Patricia testified that at the time the statement was made Judy was crying and very upset over what had happened. While the transcript is not clear exactly how much time had elapsed between the incident in question and the recounting of the course of events to Patricia, it appears that the trial court did not abuse its discretion in finding that Judy was still under the influence of the stress of the event. Therefore, the admission of the statement was not error.[1]
The second statement that Defendant has alleged was improperly admitted relates to a phone call Judy received approximately two weeks prior to her death. Patricia Abbott testified that she was at Judy's home when Judy received the phone call in question. Following this phone call, Judy was shaking, crying, and noticeably upset. Judy told Patricia that the phone call was from Defendant and that he had told her "[t]hat he would see her dead before she broke up him and his wife."[2] This call clearly falls within the excited utterance exception. As shown in Patricia's testimony, the phone call clearly upset Judy and caused her great distress. Additionally, the statements were made immediately after the phone call ended and related specifically to the phone call. Finally, there is nothing to indicate that the stress caused by the phone call had ended. Therefore, the statement was properly admitted as an excited utterance.
Defendant has also argued that there was a second phone call testified to by Patricia. It appears that Defendant's arguments regarding the applicability of the excited utterance exception to the hearsay rule are directed at this second phone call more so than the first. However, while Patricia indicated that she was told of two phone calls, she related the circumstances and facts surrounding only the one she was present to witness. Therefore, Defendant's contentions regarding the second phone call are without merit as there were no statements even made with regard to this call.
The third statement that Defendant has alleged as error is where Patricia testified that Judy said, "she was tired of being scared, that she couldn't live like that anymore and she was going to just go home." However, a review of the transcript shows that Defendant's objection to this statement was sustained by the trial court. While Defendant has argued that the fact that the court sustained the objection is irrelevant and that the damage had already been done, this Court shall presume that the jury followed the instructions from the trial court to disregard such statements. State v. Henderson (1988), 39 Ohio St.3d 24, 33.
The fourth, fifth and sixth statements that Defendant has pointed to as hearsay improperly admitted under the excited utterance exception all relate to the testimony by three different witnesses that Judy was afraid of Defendant. While Defendant has postulated that this testimony was admitted as an excited utterance, the transcript does not support this assertion. In all three statements the witnesses testified that Judy feared Defendant. They further testified that they knew this information because they had spoken with her regarding this fear. Defendant has argued that the excited utterance exception has been improperly utilized to admit this testimony. However, this testimony is admissible under Evid.R. 803(3) as a statement of Judy's mental state. Therefore, the statements were properly admitted.
Defendant's first assignment of error is without merit.
 ASSIGNMENT OF ERROR II The trial court erred in admitting hearsay testimony that did not fall within Ohio Rule of Evidence 803(4) thereby denying [Defendant] a fair trial.
In his second assignment of error, Defendant has argued that the trial court improperly admitted hearsay testimony under Evid.R. 803(4), statements for purposes of medical diagnosis or treatment. We disagree.
Hearsay is generally not admissible unless the statement comes under some exception to the hearsay rule. Evid.R. 802. Pursuant to Evid.R. 803(4), hearsay testimony is admissible where it consists of "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."
Defendant has argued that the testimony given by Dr. Ann Kantaras, the chief pediatric resident at Akron Children's Hospital who examined Brooke; Detective Matthew Hudak; the detective who investigated the case; Daren Marshall, the social worker assigned to oversee Brooke upon her admission to the CARE unit; Dr. Cindi Croft, the doctor who examined Brooke at Barberton Hospital; Dr. Dawn Lord, Brooke's treating psychologist; and Robin Tener, the counselor who saw Brooke shortly after the crime; was not properly admitted under Evid.R. 803(4). We disagree.
In State v. Dever (1992), 64 Ohio St.3d 401, the Ohio Supreme Court reviewed the admissibility of a child declarant's statements under Evid.R. 803(4). The Ohio Supreme Court held in that case that statements made by a child identifying the perpetrator in the course of medical treatment or diagnosis are admissible under Evid.R. 803(4) so long as the statements are made for the purposes enumerated in the rule. Dever, 64 Ohio St.3d at paragraph two of the syllabus. Specifically, the Ohio Supreme Court noted in its analysis that where the statements appear to have been "inappropriately influenced by another, then those statements would not have been made for the purpose of diagnosis or treatment." Id. at 410. The trial court is to review whether the statements are in response to leading questions or if any extraneous factors exist that would taint the statements reliability. Id. "If no such factors exist, then the evidence should be admitted." Id. This Court has stated that Evid.R. 803(4) "has been interpreted as including diagnosis or treatment related not only to physical injuries, but also to psychological injuries." State v. Grooms (Aug. 19, 1998), Summit App. No. 18558, unreported, at 5.
The testimony Defendant assigns as erroneously admitted was discussed above in this Court's review of Defendant's sixth assignment of error. Upon review of the evidence, it is clear that each of these individuals obtained the information testified to during the course of the medical treatment of Brooke following this brutal attack. It was imperative that each of these individuals understood what had transpired in order to better treat the physical and emotional injuries suffered by this young child. The testimony at trial established that there were no indications that the statements given by Brooke were in response to any external, suggestive influences. Therefore, the statements were properly admitted under Evid.R. 803(4).
Defendant's second assignment of error is overruled.
 ASSIGNMENT OF ERROR III The trial court erred in not ordering a mistrial following improper closing argument by prosecution.
In his third assignment of error, Defendant has argued that the trial court erred by failing to order a mistrial following inflammatory statements made by the State during closing arguments. We disagree.
When reviewing allegations of prosecutorial misconduct, appellate courts must consider that "`the touchstone of due-process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.'" State v. Hill (1996), 75 Ohio St.3d 195, 203, quoting Smith v. Phillips (1982), 455 U.S. 209, 219,71 L.Ed.2d 78, 87. The Ohio Supreme Court has declared that prosecutorial misconduct is not grounds for error unless the defendant has been denied a fair trial. State v. Maurer (1984), 15 Ohio St.3d 239,266. In order to reverse a conviction based on prosecutorial misconduct, the defendant must prove that the comments were improper and that they prejudicially affected the defendant's substantial rights. State v. Smith (1984), 14 Ohio St.3d 13, 14. The Ohio Supreme Court has noted that "`[c]onsiderable latitude is permitted in closing arguments, and the question is generally considered one falling in the first instance within the sound discretion of the trial court.'" (Alteration in original.)Maurer, 15 Ohio St.3d at 269, quoting State v. Pustare (1973),33 Ohio App.2d 305, 312. "[W]here it is apparent from the peculiar facts and circumstances of the particular case that such discretion has not been abused a reviewing court will not ordinarily interfere." Golamb v. Layton (1950), 154 Ohio St. 305, paragraph four of the syllabus.
Defendant interposed no objection to the challenged argument of the State. Where defense counsel fails to object to the prosecutor's remarks during trial, unless the remarks constitute plain error, a reviewing court need not consider whether these remarks prejudiced the defendant. State v. Strobel (1988),51 Ohio App.3d 31, 39; see, also, State v. Lott (1990), 51 Ohio St.3d 160,167. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court. Crim.R. 52(B). Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise. State v. Watson (1991), 61 Ohio St.3d 1,6, citing State v. Moreland (1990), 50 Ohio St.3d 58, 62; see, also State v. Coulter (1992), 75 Ohio App.3d 219, 231-232
(applying this standard of review where prosecutorial misconduct was alleged but no objection was interposed below).
Defendant does not appear to argue that the statements by the State were unsupported by the evidence presented at trial. Rather, Defendant appears to raise contention with commentary made by the State with regard to statements concerning the evidence. The State may properly comment upon the evidence presented at trial. While Defendant may label these comments as inflammatory, their admission does not rise to the level necessary to constitute an abuse of discretion. Therefore, it was certainly not plain error to permit such statements.
Defendant's third assignment of error is overruled.
 ASSIGNMENT OF ERROR IV [Defendant] was denied the effective assistance of counsel at his trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.
In his fourth assignment of error, Defendant has argued that his counsel was ineffective for failing to more strenuously challenge the time of death as established by the medical examiner. Additionally, he alleges that his counsels' failure to object to inappropriate statements in the State's closing arguments rendered them ineffective. Based upon these alleged failures, Defendant contends that he was prejudiced and denied a fair trial.
The United States Supreme Court has set forth a two-part test to determine if a conviction or sentence should be reversed based upon ineffective assistance of counsel. Strickland v. Washington
(1984), 466 U.S. 668, 687, 80 L.Ed.2d 674, 693. "First, the defendant must show that counsel's performance was deficient."Id. To meet this standard Defendant must be able to prove "errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Id.
Second, Defendant must establish that the deficient performance by counsel was serious enough that it resulted in prejudice to the defendant "[so] as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. The Ohio Supreme Court set out a substantially similar standard in State v. Bradley (1989),42 Ohio St.3d 136, paragraph two of the syllabus, holding "[c]ounsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance."
"[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" Strickland, 466 U.S. at 689, 80 L.Ed.2d at 694. There are numerous ways for counsel to provide effective assistance in any given case. In light of these facts, debatable trial tactics and strategies do not constitute a denial of effective assistance of counsel. State v. Clayton (1980), 62 Ohio St.2d 45,49, certiorari denied (1980), 449 U.S. 879,66 L.Ed.2d 102.
In his first assertion, Defendant has argued that his counsel was ineffective for failing to challenge the time of death because his alibi did not cover the entire span of time the medical examiner set forth as the estimated time of death. This contention is not supported by the facts presented at trial. The time of death is established as being between 2:30 and 5:30 a.m. As noted by Defendant, at trial he presented witnesses to show that he was out at bars drinking until 2:40 a.m. He then had a witness establish that he arrived home at 2:40 a.m. While Defendant has acknowledged that his whereabouts were established for the period up to 2:40 a.m., Defendant has neglected to note that his wife testified to his whereabouts after he arrived home. Thus, it would not have been logical for defense counsel to challenge the time of death since Mindy's testimony places Defendant at his home during the time the crimes occurred. Thus, this Court is unable to find prejudice in counsels' decision not to challenge the time of death.
The second area of the trial Defendant has challenged deals with defense counsels' failure to object during the State's closing arguments. As noted above, the parties are given wide latitude in closing arguments to comment upon the evidence presented at trial. Competent counsel may reasonably hesitate to object in the jury's presence because objections may be considered bothersome by the jury and may tend to interrupt the flow of a trial. State v. Campbell (1994), 69 Ohio St.3d 38, 53. Further, viewing the prosecutor's comments in light of the entire trial, these statements were insufficient to deny Defendant the benefit of a fair trial. Therefore, Defendant's assignment of error is without merit.
Defendant's assignments of error are overruled, and the judgment of the trial court is affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the County of Summit, Court of Common Pleas, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
 ___________________________ LYNN C. SLABY
FOR THE COURT, BATCHELDER, P. J., CARR, J., CONCUR.
[1] This Court notes that this is not hearsay within hearsay even though the witness is relating the statements of Defendant to Judy as she heard them from Judy. The excited utterance permits Judy's statements to come in under Evid.R. 803(2) while Evid.R. 801(D)(2) defines Defendant's statement as nonhearsay because it is an admission by a party opponent.
[2] For the same reasons noted in footnote number one, this statement is likewise not hearsay within hearsay.