[Cite as *State v. Eisele*, 2014-Ohio-873.]

| | | | |
|---|---|---|---|
| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | | |

| | |
|---|---|
| STATE OF OHIO | C.A. No.    13CA0044-M |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| DENNIS W. EISELE | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellant | CASE No.    12-CR-0472 |

DECISION AND JOURNAL ENTRY

Dated: March 10, 2014

HENSAL, Judge.

{¶1}  Appellant, Dennis W. Eisele, appeals from his convictions in the Medina County Court of Common Pleas.  This Court affirms.

I.

{¶2}  In the early morning hours of December 31, 2011, a male 911 dispatcher answered several telephone calls placed to the Dickinson County Sheriff's Office located in Spirit Lake, Iowa.  The unidentified male caller threatened to:  1) shoot the dispatcher in the head, 2) kill a police officer, and 3) have sexual intercourse with the dispatcher's wife. According to the caller, he was in Lake Park, Iowa, which is located approximately 10 to 15 miles from Spirit Lake.  The dispatcher told the police officer who was on patrol in Lake Park about the threats and attempted to trace the caller's telephone number.  Although the telephone number purported to be local as it used an Iowa area code, the investigation revealed it was "spoofed" so that the caller's real telephone number was masked by a fake number.  Later that

day, the same caller placed additional calls to the Sheriff's Office that were answered by a female dispatcher. The caller made crude comments to her that were of a graphic and sexual nature.

**{¶3}** Mr. Eisele was indicted by the Grand Jury with one count each of: (1) intimidation, in violation of Revised Code Section 2921.03(A), a third-degree felony; (2) aggravated menacing, in violation of Revised Code Section 2903.21(A), a first-degree misdemeanor; and (3) telecommunications harassment, a violation of Revised Code Section 2917.21(A)(3), a first-degree misdemeanor. A jury trial was held, and Mr. Eisele was convicted of all the offenses. He now appeals from his convictions and raises two assignments of error for this Court's review.

II.

ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN ALLOWING THE STATE TO IMPEACH
THE DEFENDANT WITH PRIOR CONVICTIONS.

**{¶4}** Mr. Eisele argues that the trial court erred when it allowed the State to impeach his credibility by eliciting testimony from him about his prior criminal history. He maintains that this evidence exceeded the scope of Evidence Rule 609 in that the goal of the State was to highlight the fact that his prior criminal history included charges that were similar to the offenses in the present case. This Court agrees with Mr. Eisele that the evidence was improper under Rule 609, but concludes that the error was harmless.

**{¶5}** "Trial courts possess broad discretion in determining the admissibility of evidence." *State v. Myers*, 9th Dist. Summit No. 25737, 2012-Ohio-1820, ¶ 9, citing *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984); *State v. Sommerville*, 9th Dist. Summit No. 25094, 2010-Ohio-3576, ¶ 4, quoting *State v. Wright*, 48 Ohio St.3d 5 (1990), syllabus ("The trial judge

* * * has broad discretion in determining the extent to which testimony will be admitted under Evid.R. 609.") "[T]his [C]ourt will not overturn a trial court's evidentiary determination in the absence of an abuse of discretion that resulted in material prejudice to the defendant." *State v. Myers*, 9th Dist. Summit No. 25737, 2012-Ohio-1820, ¶ 9. An abuse of discretion "implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶6}    Under Evidence Rule 609(A)(2), evidence that the defendant was convicted of a crime punishable by death or imprisonment in excess of one year is admissible for purposes of impeaching the witness's credibility "if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." If the evidence is admissible under Rule 609, "the fact of the conviction may be proved only by the testimony of the witness on direct or cross-examination, or by public record shown to the witness during his or her examination." Evid.R. 609(F).

{¶7}    Here, the State elicited testimony from Mr. Eisele that exceeded the scope of what was permissible under Rule 609. Mr. Eisele testified in his own defense at trial. When the prosecution asked him what conviction led to his current incarceration, he refused to answer. The State proceeded to question Mr. Eisele about the specific facts of the conviction as follows:

Q: It has to do with making bomb threats on the phone to Burger King, yes?

A: That was her ex-boss, yes.

Q: Whose ex-boss?

A: Robin Music's ex-boss.

Q: Right. And you're in prison for it, right?

A: Right.

Q: She wasn't charged in that case at all, never was, was she?

A: Nobody even - - the victim thought we both should have been.

Q: Well, okay.  But you made the calls and you made bomb threats.

A: I did not, no.

Q: You threatened to rape the woman who answered the phone.

A: Incorrect.

Q: That's not correct?

A: I didn't make the calls, so I did not - -

Q: You pled to it.

A: No I didn't.

Mr. Eisele later testified that he was serving a prison sentence for a probation violation in the same case after he was discovered with an impermissible cell phone in his possession.  He also explained that he pleaded guilty to the charges stemming from the Burger King incident, even though he maintained he did not place the calls, because he thought he would be sentenced to probation, which would allow him to see his sick mother.

{¶8}	Further in Mr. Eisele's testimony, the State questioned him about whether he had any felony convictions in Utah.  His counsel objected on the basis of relevancy.  The trial court quoted counsel portions of Rule 609 and inquired about the nature of the case in Utah.  The State explained that it involved "similar charges with phone calls and threats."  The trial court instructed counsel that he could inquire of Mr. Eisele whether he has a felony conviction in Utah, but that "it's yes or no, and then you're stuck with the answer."  When the State asked Mr. Eisele whether he had any felony convictions in Utah, he testified that:

> I don't know if they were felonies or not.  I know an ex-girlfriend had pressed charges.  Most of them were dropped because it was determined that after she

filed the charges against me she would keep continually trying to contact me, so it weakened her case, so they - - they determined that she was basically trying to set me up and most of those charges were dropped.

In another instance, the State questioned Mr. Eisele as follows:

Q: And you've never called Candlestick Park?

A: No.

Q: What was the reference to San Francisco when talking to Det[ective] Markley?

A: That was another thing that my girlfriend had done that I didn't.

Q: What?

A: I was told about it.

Q: What did she do?

A: I don't know too much about it.

* * *

Q: That has to do with phone calls, doesn't it?

A: Yeah[.]

* * *

Q: You're saying that Robin Music did this?

* * *

A: Yes, she did, she did all of those.

Q: Did all of what? Made a bomb threat to Candlestick Park - -

A: I guess.

Q: - during a playoff game? Didn't you reference that to Det[ective] Markley when you were talking to him in the jail?

A: I was asked about it at one time, yes.

Q:  Right.  And you thought by doing this - -

A:  It was a playoff game?

Q:  - - you would get a free trip to California because they were going to come get you, correct?

A:  It was a playoff game?  I didn't know what game it was.

\* \* \*

Q:  And you thought you were going to California as a result of that, that they would come and get you.  That's what you said.

A:  I thought I would be charged.

{¶9}    The evidence concerning Mr. Eisele's prior incidents was not proper under Rule 609 as it presented evidence beyond the fact that he had been convicted of a crime that was punishable by imprisonment in excess of one year.  There was no evidence presented at trial that he was convicted of any of the charges, or in the case involving the telephone calls to Candlestick Park, whether he was ever charged with an offense.  Further, it is apparent from this Court's review of the record that the State's purpose in introducing such evidence was not to attack Mr. Eisele's credibility, but rather to demonstrate that he had acted in conformity with prior acts involving similar conduct and was, therefore, likely to have committed the offenses alleged in the present case.

{¶10}   Although the admission of this evidence was improper under Rule 609, this Court finds that the error was harmless.

> If this Court determines that the trial court improperly admitted the evidence, this Court must then determine whether the error constituted harmless error beyond a reasonable doubt.  The application of the harmless error rule is simple; if, in the absence of all erroneously admitted evidence there remains overwhelming evidence of guilt, then the error was harmless.

(Citations omitted.) *State v. Turner*, 9th Dist. Summit No. 26591, 2013-Ohio-2433, ¶ 23.

{¶11} The jury heard Mr. Eisele's recorded interview with the lead investigator wherein he not only admitted to making the telephone calls to the Dickinson County Sheriff's Office, but also how and why he made the calls. Mr. Eisele testified at trial that he owned and used a spoof card. He further testified that while he did not make the telephone calls, he confessed so as to protect his friend, Robin Music, from a possible parole violation that would have sent her back to prison and prevented her from seeing her daughter. Mr. Eisele presented no corroborating evidence to verify his trial testimony that contradicted what he told the lead investigator in his earlier interview. Thus, even if the evidence of Mr. Eisele's prior police involvement involving similar conduct had not been admitted, there is overwhelming evidence that he was guilty of the offenses. This Court concludes that the trial court's error in admitting this evidence was harmless. Mr. Eisele's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN FINDING APPELLANT GUILTY OF THE CHARGES BECAUSE THE FINDING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶12} Mr. Eisele argues in his second assignment of error that his convictions were against the manifest weight of the evidence. This Court disagrees.

{¶13} To determine whether Mr. Eisele's convictions were against the manifest weight of the evidence, this Court:

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340, (9th Dist.1986). Weight of the evidence pertains to the greater amount of credible evidence produced in a trial to support one side over the other side.

*State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.* The appellate court should only exercise its power to reverse a judgment as against the manifest weight of the evidence in exceptional cases. *State v. Carson*, 9th Dist. Summit No. 26900, 2013-Ohio-5785, ¶ 32, citing *Otten* at 340.

{¶14} Mr. Eisele contends that his conviction for intimidation was against the manifest weight of the evidence because the sheriff's office dispatchers did not testify to conduct that constituted an unlawful threat. He was convicted of one count of intimidation under Revised Code Section 2921.03(A), which provides that: "No person, knowingly and by force, by unlawful threat of harm to any person * * * shall attempt to influence, intimidate, or hinder a public servant * * *." "[W]hile the statute does not define 'unlawful threat,' this Court has defined it in this context as '[n]ot authorized by law; illegal' or 'criminally punishable[.]'" *State v. Harris*, 9th Dist. Lorain Nos. 09CA009605, 09CA009606, 09CA009607, 2010-Ohio-1081, ¶ 14, quoting *State v. Rivera-Rodriguez*, 9th Dist. Lorain Nos. 07CA009154, 07CA009166, 2008-Ohio-1461, ¶ 25.

{¶15} Richard Zalabowski, a Dickinson County 911 operator, testified that he received several calls from an unknown male who threatened his life and the lives of police officers. The calls appeared to originate from a telephone number with a 712 area code, which is an Iowa area code. The caller told him that "he wanted to put a bullet in [Mr. Zalabowski's] head." The caller refused to give his name, but did say he was "in" the town of Lake Park, Iowa, which is within the jurisdiction of the Dickinson County Sheriff's Department and located approximately 10 to 15 miles away. Mr. Zalabowski testified that he followed his training protocol by notifying the

officer on duty in Lake Park of the nature of the calls and by attempting to track the originating number of the caller. He was advised by the telephone company that the caller "spoofed" the number he was calling from, which occurs when the originating number is made to appear as a different number on caller id. Mr. Zalabowski further testified that he "did not take these [calls] as a joke" and that he was so concerned for his safety that he notified his superiors about the nature of the calls.

{¶16} Alysha Harlow, also a Dickinson County 911 operator, testified that she received two "disturbing" telephone calls that were graphic and sexual in nature from a male who would only identify himself as "Ed." She testified that the call appeared to originate from a number with a 712 area code. She reported the calls to the deputy assigned to the investigation of the calls. Ms. Harlow reported the calls because she received information that Mr. Zalabowski had received threatening calls and all other dispatchers were instructed to report any incidents involving the same caller.

{¶17} In addition to the testimony from the dispatchers, the jury heard recordings of the calls, which consisted of four calls answered by Mr. Zalabowski and two calls answered by Ms. Harlow. The caller told Mr. Zalabowski to "go kill yourself or I'll kill you." He further stated that, "I'm going to fucking kill a cop. I feel like killing a cop as we head into the New Year." When Mr. Zalabowski asked him to identify himself, the caller stated that "you'll find out when you get a bullet right in your head." The caller asked if he could engage in sexual intercourse with Mr. Zalabowksi's wife "after I kill you." During one of the calls, Mr. Zalabowski told the caller that unless he told him why he needed assistance, he would hang up as the caller was "tying up a needed phone line." The caller proceeded to made additional telephone calls to the Dickinson County Sheriff's Office even after Mr. Zalabowksi advised him his calls were coming

in on a necessary line. While the caller did not make any direct statements that implied he would commit physical violence against Ms. Harlow, he did describe in crude and graphic language how he wished to engage in sexual conduct with her.

{¶18} Mr. Eisele relies on the case of *State v. Yambrisak*, 5th Dist. Richland No. 2012-CA-50, 2013-Ohio-1406 to support his argument that the substance of the threats was "unconditional, not immediate * * * not specific and * * * in no way hinder[ed] * * * or influence[d] [the dispatcher] in the discharge of his duties." However, the facts of *Yambrisak* are distinguishable from those of the present case. Byron Yambrisak was convicted of retaliation and intimidation of a sheriff's department detective after he yelled racial slurs at her as she conversed with an acquaintance in a hospital parking lot. The victim was a detective who knew Mr. Yambrisak as she had investigated an allegation two years earlier that he had attempted to hire someone to kill his ex-girlfriend. The Fifth District reversed his convictions and ordered the trial court to enter judgments of acquittal on all counts as there was insufficient evidence to convict him. The court concluded that the racial slurs were not threatening and were "statements of Yambrisak's feelings and opinions." *Id*. at ¶ 33. With regard to his threat to "f*** [the detective] up," the court concluded that his choice of words were ambiguous and failed to convey a particular criminal act. *Id*. at ¶ 34. In addition, the court determined that Yambrisak's words were "too [ ]equivocal, unconditional, not immediate and not specific enough to convey to [the detective] that [he] was attempting to influence, intimidate, or hinder [the detective] in the discharge of her duties." *Id*. at ¶ 41. The court further noted that there was no evidence that Yambrisak interfered with the detective's official duties.

{¶19} In the present case, Mr. Eisele threatened several times to kill Mr. Zalabowski, specifically, by shooting him in the head. He indicated to the dispatcher that he was in a town

located in the same geographical area. Mr. Eisele further stated that he was going to kill a police officer "as we head into the New Year." The telephone calls were received on December 31, 2011, thus, signifying that the threat was immediate. This Court further notes that the tone Mr. Eisele used with each dispatcher was authoritative and commanding. He repeatedly conveyed to Ms. Harlow in particular that "[he] give[s] the orders" and berated her for disconnecting one of the calls because he did not tell her to do so.

{¶20} In addition, we recognize that more than one call was placed to the Dickinson County Sheriff's Office. Mr. Zalabowski and Ms. Harlow had to answer each call and engage with Mr. Eisele during the duration of the call, which rendered them unable to assist other callers who may have had urgent and appropriate requests for assistance. Both dispatchers had to take time to document each call and forward the necessary information for other departmental personnel to investigate.

{¶21} Based on the foregoing, this Court concludes that Mr. Eisele's intimidation conviction was not against the manifest weight of the evidence. There was ample, credible evidence from which the jury could determine that his conduct constituted an "unlawful threat of harm" that was an attempt to "intimidate[ ] or hinder a public servant." R.C. 2921.03(A).

{¶22} Mr. Eisele further argues that his convictions are against the manifest weight of the evidence because there was no direct evidence linking him to the telephone calls. Detective Matthew Markley from the Wadsworth Police Department testified that he was assigned to investigate the calls, which the Dickinson County authorities determined originated from Wadsworth, Ohio. According to Detective Markley, he interviewed Mr. Eisele twice. On the first occasion, Mr. Eisele denied any knowledge of the situation. On the second occasion, Mr. Eisele admitted multiple times during the interview to making the phone calls. He testified that

Mr. Eisele told him the calls were to a sheriff's department, which was a detail Detective Markley had never mentioned to him. Detective Markley further testified that Mr. Eisele told him he made the calls to instigate an investigation into an illegal telephone chat line operated by an individual in Canada that used the same 712 area code as Dickinson County. According to Detective Markley, Mr. Eisele maintained that he did not intend to kill anyone, that he was bored due to a lack of transportation, and that he hoped the dispatcher would have a sense of humor about the situation. Mr. Eisele told Detective Markley to tell the Dickinson County authorities that he was sorry and that he would be willing to apologize to them via video. The jury heard a recording of Detective Markley's interview with Mr. Eisele wherein he admitted his involvement in the calls.

{¶23} However, when Mr. Eisele testified in his own defense at trial, he denied making the telephone calls. He maintained that a friend/caregiver that lived with him, Robin Music, was responsible for the calls. According to Mr. Eisele, Ms. Music admitted to him in a jailhouse conversation that she "set [him] up" and that she and two men, named "White George" and Rodney Stout, made the calls on a three-way line. Mr. Eisele contends that he told Detective Markley he was responsible because he did not want Ms. Music to be sent to prison for a parole violation for engaging in such conduct, which would render her unable to see her daughter. He also maintained that he did not subsequently tell the police that he was set up because Ms. Music still had access to both his and his mother's "stuff." Mr. Eisele admitted to owning a spoof card and testified to how it worked. He further testified that Ms. Music had access to the spoof card as she handled all his computer and telephone transactions due the fact that he is completely blind.

{¶24} Detective Markley testified that the Wadsworth Police Department did not trace the calls and that the telephone numbers in question were investigated by Iowa authorities. Accordingly, Mr. Eisele is correct that there was no corroborating evidence, such as the testimony or documentation from someone in Iowa that demonstrates how the telephone calls were traced to him. He did not, however, proffer any evidence that supported his trial testimony. In addition, Mr. Eisele's recantation of his involvement undermined his own credibility. "[A] jury is free to believe or reject the testimony of each witness, and issues of credibility are primarily reserved for the trier of fact." *State v. Miles*, 9th Dist. Summit No. 26187, 2012-Ohio-2607, ¶ 24, quoting *State v. Rice*, 9th Dist. Summit No. 26116, 2012-Ohio-2174, ¶ 35. "A verdict is not against the manifest weight of the evidence because the [jury] chose to believe the State's witnesses rather than the defendant's version of the events." *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16.

{¶25} After a careful review of the record, we do not agree that this is the exceptional case where the jury lost its way by convicting Mr. Eisele of all offenses. *See Otten*, 33 Ohio App.3d at 340. His second assignment of error is overruled.

### III.

{¶26} Mr. Eisele's assignments of error are overruled. The judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed.

―――――

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
JENNIFER HENSAL
FOR THE COURT


WHITMORE, J.
CONCURS.

CARR, P. J.
CONCURRING IN JUDGMENT ONLY.

{¶27} I concur in the judgment but write separately with respect to the first assignment of error. I would conclude that Eisele opened the door for the State's inquiry regarding the Burger King incident involving his friend, Robin Music. On direct examination, Eisele testified that he falsely took the blame for the calls during his interview with Det. Markley in order to protect Music. Eisele testified that he did this because Music was on parole, and he did not want her to go back to prison. On cross-examination, Eisele was asked why he would make a false confession when there was very little chance the calls would be linked to Music. Eisele

responded that there was "another case that we were both involved in." Eisele explained that he and Music were previously involved in a case that led to Eisele serving a prison sentence, and that "all of that then connected with this." As Eisele testified that he was motivated to lie to Det. Markley because of his criminal history with Music involving similar circumstances, it was appropriate for the State to explore that issue on cross-examination.

APPEARANCES:

CONRAD G. OLSON, Attorney at Law, for Appellant.

DEAN HOLMAN, Prosecuting Attorney, and MATTHEW A. KERN, Assistant Prosecuting Attorney, for Appellee.